Claire C. PONTBRIAND, Russell W. Klowan, Louis Quigley, Francine G. Buckley, P.A. Buckley, Bethanne Dressel–Hostetter, David G. Hostetter, and George K. Mooradian

v.

Bruce SUNDLUN, Governor of the State of Rhode Island, and John and Jane Does 1–10.

No. 95–571–Appeal.

Supreme Court of Rhode Island.

Aug. 15, 1997.

John Glasson, Providence, for Plaintiff.

Richard B. Wooley, Asst. Attorney General, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

WEISBERGER, Chief Justice.

■ This case comes before us on appeal by the plaintiffs from a summary judgment entered in the Superior Court in favor of the defendants and from denial of the plaintiffs' cross-motion for summary judgment. Given the posture of this case, the pleadings, affidavits, admissions, and other materials before the court must be viewed in the light most favorable to the parties opposing the summary-judgment motions. *O'Hara v. John Hancock Mutual Life Insurance Co.,* 574 A.2d 135, 136 (R.I.1990). The moving parties are then entitled to prevail only if the record reveals no remaining issues of material fact, and they are entitled to judgment as a matter of law. *Id.* On appeal we review the trial justice's decision to grant a summary-judgment motion de novo, applying the same standard. *Westinghouse Broadcasting Co. v. Dial Media, Inc.,* 122 R.I. 571, 579, 410 A.2d 986, 990 (1980). Because we are reviewing a decision rendered on summary-judgment motions filed by both of the adversary parties, we have treated the relevant allegations of both parties in the most favorable light insofar as they opposed the respective motions for summary judgment.[1] On that basis we sustain the plaintiffs' appeal in part, reverse

---

1. The only submission in the record before us made to the trial justice outside of the pleadings was an affidavit by Sheldon Whitehouse, then counsel to the Governor. The trial justice appears not to have relied upon this in reaching his ruling. Instead he seems to have decided the issues in this case as questions of law.

the trial justice's grant of summary judgment for the defendants and affirm his denial of the plaintiffs' motion for summary judgment.

## I

### Introduction and Facts of the Case

This case presents issues of first impression requiring this court to consider important aspects of what Justice Louis D. Brandeis once termed "the right to be let alone." [2] The plaintiffs before this court, all of whom were depositors in various insolvent financial institutions (hereinafter plaintiffs or depositors), contend that information in respect to their accounts at these financial institutions was wrongfully released to the news media. They argue that this information was furnished to the state for a lawful but limited purpose and should have remained confidential. Their unusual claim arises out of the traumatic events of January 1991.

On the first day of that month, the Governor of the State of Rhode Island, the Honorable Bruce Sundlun (the Governor), took emergency action under G.L.1956 chapter 18 of title 19 [3] and declared a bank emergency in Rhode Island, thereby closing all state-chartered banks and credit unions not covered by federal deposit insurance. The closing of these financial institutions was designed to allow banks and credit unions that had been formerly insured by the insolvent Rhode Island Share and Deposit Indemnity Corporation (RISDIC) to obtain adequate deposit insurance prior to reopening. Some of the closed institutions were able to obtain deposit insurance from the Federal Deposit Insurance Corporation (FDIC) and reopened, but a number of such institutions could not meet the requirements for federal insurance and remained closed. The closure of these institutions denied more than 190,000 people access to over $1 billion in deposits. In response to this ongoing banking crisis, the Governor proposed to the Legislature the enactment of the Rhode Island Depositors Economic Protection Act (DEPCO act), now codified as G.L.1956 chapter 116 of title 42. The act was designed to end the continuing banking crisis by reimbursing depositors at the failed institutions with public funds.

One provision of the DEPCO bill, however, met opposition. This section proposed to reimburse all non-offending depositors up to the full amount of their deposits, even if their account balances exceeded the $100,000 limit to which the FDIC would have insured deposits. According to the Governor, this provision was estimated to cost the state an extra $80 million. The Governor contends that uncertainty regarding the identity of these "over $100,000" depositors, as well as suspicions that they were all politically well-connected people, was affecting legislators' judgments about the merits of passing the DEPCO act and appropriating the necessary funds to compensate the depositors. The Governor said that to "clear the air," and to aid passage of the DEPCO bill, he decided that the names of those depositors who had deposits in excess of $100,000 should be released. On January 30, 1991, he released to the media a list that contained the names of more than 900 people who had deposits of over $100,000 in the closed institutions. [4] Along with each name was set forth the individual's Social Security number and account balance. [5] Also attached was a cover memo dated January 30, 1991 [6] which reads as follows:

"To All Members of the Media Receiving the Attached Documents:

The attached documents contain private information. We believe that the public interest in the present vigorous debate about legislation to provide public funds for the private benefit of the over $100,000

---

2. *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944, 956 (1928) (Brandeis, J., dissenting).

3. These provisions were repealed by P.L.1995, ch. 82, § 20, effective July 1, 1995. Similar provisions were enacted as G.L.1956 chapter 13 of title 19.

4. The actual date of release has not been established with precision.

5. This list has not been made available to this court on appeal but these facts are apparently undisputed.

6. By clerical error, the memo was dated January 30, 1990.

depositors justifies the release of this data. We also do not desire to doctor or redact the documents.

We strongly urge you to respect the private nature of the enclosed information. We recognize your significant obligation to provide the information necessary for full and public debate on a significant possible expenditure of state and taxpayer funds. We ask that you maintain the privacy of the enclosed information to the maximum extent consistent with your obligations."

Included among those on the list were the names, Social Security numbers, and account balances of plaintiffs in this case. Following the release of this information by the Governor, the *Evening Times*, a newspaper in Pawtucket, Rhode Island, published a partial list of the depositors, along with their account balances. Two of the depositors pressing claims before this court were listed in the *Evening Times*. Other than the republication in the *Evening Times* there is no indication that other names were published either by the *Evening Times* or other newspapers.

The Governor contends that his action in releasing the names of those depositors with accounts over $100,000 dispelled suspicion and allowed the DEPCO bill eventually to pass, thereby ensuring that the depositors were fully compensated.

The depositors filed suit in Superior Court on September 9, 1991, against Bruce Sundlun, Governor of the State of Rhode Island, in his official capacity, and various unnamed defendants.[7] The plaintiffs allege violations by the Governor of the privacy protections afforded by several state and federal statutes, to wit, G.L.1956 §§ 9–1–28.1, 19–14–2,[8] 38–2–1, 42 U.S.C. § 1983, 12 U.S.C. § 3401, and the Federal Privacy Act of 1974, P.L. 93–579, § 7, as well as violations of the protections afforded by both the Federal and State Constitutions. The depositors sought injunctive relief preventing further release of

the information and a declaration, pursuant to G.L.1956 § 9–30–1, that the Governor's actions were illegal. They also sought compensatory and punitive damages and attorney's fees. The petition for preliminary injunction was passed without hearing.

After a period of time, both parties filed motions for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. After reading the parties' submissions, the trial justice rendered a decision from the bench on August 29, 1995.[9] In his decision the trial justice noted the Governor's reliance upon the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), which had established that an individual has no protectable privacy interest in a bank record. He further noted the Governor's contention that the banking crisis and the authority granted by chapter 18 of title 19 allowed him to disclose the information. Finally he observed that the names of only two plaintiffs had been published in the *Evening Times*. Without further specifying his grounds of decision, he found that "there is merit in the arguments which are raised by the defendant in this case" and granted the Governor's motion for summary judgment. The instant appeal followed.

## II

### Standing to Sue

We first address the Governor's contention that because only the names of plaintiffs Claire C. Pontbriand and Russell W. Klowan were actually "published" in the article in the *Evening Times*, the other plaintiffs had no standing to sue.

In *Rhode Island Ophthalmological Society v. Cannon*, 113 R.I. 16, 317 A.2d 124 (1974), we discussed our requirements for standing in light of *Association of Data Pro-*

---

7. The depositors allege on appeal that suit was filed because of fears the Governor would re-release the information on their accounts.

8. General Laws 1956 § 19–14–2 was repealed by P.L.1995, ch. 82, § 15. Comparable provisions were enacted and codified as G.L.1956 chapter 4 of title 19.

9. The trial justice considered the case as an action which sought retrospective relief in the form of damages. He noted that a hearing on the depositors' request for an injunction was never held. He expressed the opinion that perhaps the parties had privately agreed not to disseminate information on the depositors' accounts further.

*cessing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and held:

> "It is our belief that standing can now be determined by our adoption of the first of the *Data Processing* criteria. The question is whether the person whose standing is challenged has alleged an injury in fact resulting from the challenged [act]. If he [or she] has, he [or she] satisfies the requirement of standing." *Cannon,* 113 R.I. at 26, 317 A.2d at 129.

We described our standing requirement as "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Id.* at 22, 317 A.2d at 128 (quoting *Camp,* 397 U.S. at 152, 90 S.Ct. at 829, 25 L.Ed.2d at 187).[10] Sometimes referred to as the "injury in fact" requirement, *see, e.g., Cannon,* 113 R.I. at 23, 317 A.2d at 128, this has been described by Justice Scalia in an oft-quoted passage as "an invasion of a legally protected interest which is (a) concrete and particularized * * * and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992). To this statement we would add a highly relevant comment from an analogous area of our standing jurisprudence: "The line is not between a substantial injury and an insubstantial injury. The line is between injury and no injury." *Matunuck Beach Hotel, Inc. v. Sheldon,* 121 R.I. 386, 396, 399 A.2d 489, 494 (1979) (quoting Davis, *Administrative Law of the Seventies* § 22.02–10 at 507 (1976)). *See also Blackstone Valley Chamber of Commerce vs. Public Utilities Commission,* 452 A.2d 931, 933 (R.I.1982).

■ We have little difficulty in determining that all the depositors have standing to bring this complaint. They allege, and the Governor has admitted, the release of certain information to members of the media. They contend that this official act violated certain legal rights they possess individually and that they suffered injury as a result. Even though further publication by the press of the information contained in the Governor's January 30 release might have increased the injury suffered by certain of the depositors, *cf.* Restatement (Second) *Torts* § 576 (1977) (liability for harm caused by repetition of libel or slander), that does not negate the allegations in the complaint that the release of information on their accounts, even if not *further* published, invaded a legally protected interest resulting in concrete and particularized harm. Nothing more is required for standing.[11] Having determined that the depositors have standing, we shall address first their state and then their federal claims.

## III

### State Law Claims

The depositors contend that the Governor's action, in releasing information about their accounts, constituted violations of Rhode Island statutes. We shall address one in some depth, including the defenses to liability thereunder raised by counsel for the Governor. We shall then briefly consider their other claims. We first address the depositors' contention that the Governor violated statutorily created privacy rights by intruding into their seclusion and giving publicity to matters in their private lives.[12]

### A

### Rhode Island General Laws 1956 § 9–1–28.1—Privacy Rights

In an innovative article entitled *The Right to Privacy* published at 4 Harvard Law Review 193, 195 (1890), Samuel D. Warren and Louis D. Brandeis argued that an actionable right to privacy should have been recognized at common law in order to guarantee "the right 'to be let alone.'" First recognized as

---

**10.** In *Rhode Island Ophthalmological Society v. Cannon,* 113 R.I. 16, 317 A.2d 124 (1974), an organizational standing case, we declined to adopt the "zone of interest" test utilized in part by the United States Supreme Court in *Camp. See id.* at 21–26, 317 A.2d at 127–29.

**11.** We shall address "publication" as an element of the cause of action for publication of private facts later in this opinion.

**12.** Although the trial justice referred in his decision to "a common law right of privacy," we recognize that in this jurisdiction the only right to privacy is statutory in origin.

a tort at common law in the case of *Pavesich v. New England Life Insurance Co.*, 122 Ga. 190, 50 S.E. 68 (1905), the principles of this tort are enumerated in the Restatement (Second) *Torts* § 652A (1977).[13]

In *Henry v. Cherry & Webb*, 30 R.I. 13, 18, 73 A. 97, 99 (1909), this court carefully considered the issue and determined that no action for violation of a right of privacy existed at common law in this state. Our court held that the creation of such rights and remedies was a legislative rather than a judicial function. *Id.* at 37, 73 A. at 107. We reiterated this holding in *Kalian v. People Acting Through Community Effort, Inc.*, 122 R.I. 429, 408 A.2d 608 (1979), noting that "the creation of new rights of action in the field of individual privacy is a question for the * * * Legislature." *Id.* at 432, 408 A.2d at 609.

In 1980 the Legislature enacted P.L.1980, ch. 403, § 1, codified as G.L.1956 § 9–1–28.1, making it "the policy of this state that every person in this state shall have a right to privacy." Section 9–1–28.1(a). In passing § 9–1–28.1, the Legislature explicitly afforded protection to the four interests encompassed within the "common law tort" recognized by the Restatement though not recognized as such in this state.[14] To effectuate these privacy rights, the General Assembly created an express remedy for their violation:

> "(b) *Right of Action.*—Every person who subjects or causes to be subjected any citizen of this state * * * to a deprivation and/or violation of his right to privacy shall be liable to the party injured in an action

at law, suit in equity or any other appropriate proceedings for redress in either the superior court or district court of this state. The court having jurisdiction of an action brought pursuant to this section may award reasonable attorneys' fees and court costs to the prevailing party." Section 9–1–28.1.

The depositors allege violations of two separate privacy rights through the Governor's actions. They contend that the Governor has committed an unreasonable intrusion upon their seclusion, § 9–1–28.1(a)(1), and that he has given unreasonable publicity to matters in their private lives, § 9–1–28.1(a)(3).

1

**Tort of Intrusion**

■ Section 9–1–28.1(a)(1) protects "[t]he right to be secure from unreasonable intrusion upon one's physical solitude or seclusion." Liability exists when there is an "invasion of something that is entitled to be private or would be expected to be private," § 9–1–28.1(a)(1)(A)(i), and the invasion would be "offensive or objectionable to a reasonable man." Section 9–1–28.1(a)(1)(A)(ii).[15] The person who discloses the information need not benefit from the disclosure to be held liable. Section 9–1–28.1(a)(1)(B).

Since there are no allegations in the complaint that the information possessed by the Governor was acquired through any wrongful or improper means, the depositors have not stated a cause of action for intrusion under

---

**13.** Section 652A of the Restatement (Second) *Torts* provides:

"General Principle
(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
(2) The right of privacy is invaded by
 (a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or
 (b) appropriation of the other's name or likeness, as stated in § 652C; or
 (c) unreasonable publicity given to the other's private life, as stated in § 652D; or
 (d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E."

**14.** The four rights protected by G.L.1956 § 9–1–28.1(a) are

"(1) The right to be secure from unreasonable intrusion upon one's physical solitude or seclusion;
* * *
"(2) The right to be secure from an appropriation of one's name or likeness;
* * *
"(3) The right to be secure from unreasonable publicity given to one's private life;
* * *
"(4) The right to be secure from publicity that reasonably places another in a false light before the public * * *."

**15.** *See* G.L.1956 § 43–3–3, which provides that "[e]very word importing the masculine gender only, may be construed to extend to and to include females as well as males."

§ 9–1–28.1(a)(1). *See Harris by Harris v. Easton Publishing Co.*, 335 Pa.Super. 141, 483 A.2d 1377 (1984) (no tort of invasion of privacy shown because the facts published were not obtained by intentional intrusion).

## 2

## Tort of Publication of Private Facts

The depositors also allege an infringement of their rights under § 9–1–28.1(a)(3) to avoid having their private affairs publicized. This section guarantees "[t]he right to be secure from unreasonable publicity given to one's private life." To state a cause of action a plaintiff must show (1) "publication" (2) of a "private fact" (3) that the "fact which has been made public [is] one which would be offensive or objectionable to a reasonable man of ordinary sensibilities," §§ 9–1–28.1(a)(3)(A)(i)–(ii), and (4) damages, § 9–1–28.1(b). In interpreting the requirements of what we shall refer to as the tort of publication of private facts, we again find the relevant Restatement (Second) *Torts* provision, § 652D, to be informative.[16] Since the interests asserted to have been invaded by the Governor's action are within the category to which § 9–1–28.1(a)(3) offers protection, we proceed to address each of the elements of the tort to determine if the trial justice's grant of summary judgment was appropriate.

■ We start our discussion with the first requirement, publication. Unlike the Restatement, which requires there be "publicity" given to the private information, Restatement (Second) *Torts* § 652D cmt. a, our statute requires that the information be published. Section 9–1–28.1(a)(3)(A)(i). The term "publication," by analogy to the tort of slander, does not require that the information be disseminated in a newspaper but merely that it be repeated to a third party.

*See Gaudette v. Carter*, 100 R.I. 259, 260–61, 214 A.2d 197, 199 (1965); Restatement (Second) Torts § 577.

■ Next the tort requires that any actionable disclosure must involve "private fact[s]." Section 9–1–28.1(a)(3)(A)(i). The Governor asserts that the depositors' banking records were not private as a matter of law and that therefore he cannot be held liable for their release. In this contention he relies, as did the trial justice, upon *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), for the proposition that banking records are not "private facts."[17]

In *Miller* the Supreme Court granted certiorari to consider the issue of whether a depositor has a Fourth Amendment right to privacy in the contents of his or her banking records. Quoting the statement from *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967), that "[w]hat a person knowingly exposes to the public * * * is not a subject of Fourth Amendment protection," *Miller*, 425 U.S. at 442, 96 S.Ct. at 1623, 48 L.Ed.2d at 78, the Court observed that information contained in the banking documents at issue had been voluntarily given to the bank, thereby risking its disclosure to the government. *Id.* at 442–43, 96 S.Ct. at 1624, 48 L.Ed.2d at 79. Since the information had been voluntarily disclosed, the Court found no protectable Fourth Amendment interest in the evidence obtained by the state from a third party bank's records. *Id.* at 443, 96 S.Ct. at 1624, 48 L.Ed.2d at 79.

However, *Miller*'s conclusion that there is no Fourth Amendment reasonable expectation of privacy in the contents of banking records does not necessarily apply in the circumstances presented by § 9–1–28.1(a)(3).

**16.** Section 652D of the Restatement (Second) *Torts* provides:

"**Publicity Given to Private Life**
One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
(a) would be highly offensive to a reasonable person, and
(b) is not of legitimate concern to the public."

**17.** The Governor also suggests that the names would have been released as part of an eventual receivership process involving the financial institutions and were therefore not private. However, Super. R. Civ. P. 66(e) allows a trial justice to seal reports in receivership proceedings, and we are not persuaded that the mere possibility of the release of information at some undefined point in the future for a limited legitimate purpose renders it "public" for all purposes.

That the Fourth Amendment does not prevent access to information contained in the records of financial institutions for legitimate law-enforcement purposes does not in any way suggest that the information becomes public for all purposes.

■ Having determined that the depositors' disclosure of their financial matters to their bank for a limited purpose did not constitute a waiver of all expectations of privacy they may have had, we must next determine if such an expectation did exist. Doing so requires us to determine what are "private facts" protected under § 9–1–28.1(a)(3)(A)(i). The use of the term "unreasonable," in defining the gravamen of the tort, draws us inevitably to Justice Harlan's oft-quoted definition of a "reasonable expectation of privacy" from the context of the Fourth Amendment: "first that a person must have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588 (Harlan, J., concurring).

■ We conclude that Justice Harlan's subjective/objective test provides an excellent definition of the interests the Legislature sought to protect in creating a right to privacy. It requires that a claim to privacy be bona fide and of a type that a reasonable person would expect to be observed. Therefore, in order for the action in tort to lie, we hold that plaintiffs must demonstrate that they actually expected a disclosed fact to remain private, and that society would recognize this expectation of privacy as reasonable and be willing to respect it. These issues in the first instance constitute mixed questions of law and fact to be determined by the trier of fact in a trial on the merits.

■ Applying this standard to the facts of the case at bar we conclude that a trier of fact might well determine that the depositors had an expectation of privacy in their bank records and might also find that the depositors entertained a good faith belief that their bank records would not be publicized. Such expectations have been recognized in respect to the bank's obligation to maintain privacy

in *Suburban Trust Co. v. Waller,* 44 Md.App. 335, 408 A.2d 758 (1979) (bank has obligation not to disclose financial information of depositors save by compulsion of law); *see also Tournier v. National Provincial and Union Bank of England,* 1 K.B. 461 (1923) (opinion of Lord Justice Bankes); *see generally* Edward L. Raymond, Jr., Annotation, *Bank's liability, under state law, for disclosing financial information concerning depositor or customer,* 81 A.L.R.4th 377 (1990). In the case at bar, we regard these issues as they relate to the Governor as mixed questions of law and fact.

■ Next, for liability to exist, "[t]he fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities." Section 9–1–28.1(a)(3)(A)(ii). This requirement ensures that any disclosure be of the sort that could be expected to inflict harm on the person whose private affairs are made points of public discussion. This issue, of course, involves a factual determination of what would be offensive or objectionable in the context of this case.

The Governor has contended that since the depositors benefited from his release of their information by receiving compensation from the state, they have no grounds for complaint. We take this argument as suggesting that the disclosures would not have been offensive to a reasonable person, given the end result. Without question it appears that the Governor's intention in disclosure was benign. However, whether this benign purpose would overcome or supersede the element of offensiveness should be left to the trier of fact upon remand.

Finally, we note that the depositors have alleged damages in their complaint. Since summary judgment was rendered, the issue of damages was not considered in the Superior Court. Thus the final element necessary to support this action must be left for determination upon remand. Having determined that by their allegations relating to the tort of publication of private facts plaintiffs have set forth a complaint that raises genuine issues of material fact, we next address the two defenses raised by the Governor.

## 3

### Defenses

■ In 1933 the Rhode Island Legislature enacted chapter 18 of title 19,[18] giving the Governor the power to proclaim banking emergencies. Under such an emergency proclamation all covered financial institutions would be "subject to special regulation, as hereinafter provided and otherwise subject to this chapter." Section 19–18–1. Such a proclamation allows the director of business regulation to suspend or restrict the payment of liabilities owed by the bank, § 19–18–2; to declare a bank holiday, § 19–18–5; and to draft rules and regulations to enforce the emergency requirements, § 19–18–6. The act notes that "all of the institutions to which this chapter is applicable shall be permitted to conform to the requirements of any federal proclamation, law, or regulation," § 19–18–7, and that chapter 18 of title 19 controls "insofar as any [provision is] in conflict with any other legislation." Section 19–18–12. The Governor argues in effect that he had the discretionary power to release the depositors' information because his acts fell within the broad discretion afforded him under chapter 18 of title 19.

■ In construing the scope of the powers granted the Governor under chapter 18 of title 19, we feel it is our responsibility to "determine and effectuate the Legislature's intent and to attribute to the enactment the meaning most consistent with its policies or obvious purposes." *Perrotti v. Solomon*, 657 A.2d 1045, 1048 (R.I.1995) (quoting *Brennan v. Kirby*, 529 A.2d 633, 637 (R.I.1987)). In interpreting the scope of a grant of power made by the General Assembly, we carefully consider the legislation in its entirety along with the circumstances that motivated its passage. *Brennan*, 529 A.2d at 637. We also carefully consider any constitutional considerations, and if two alternate interpretations are possible, we shall favor that which presents no potential constitutional difficulties. *Kass v. Retirement Board of the Employees' Retirement System*, 567 A.2d

358, 360 (R.I.1989); *Rhode Island State Police v. Madison*, 508 A.2d 678, 683 (R.I.1986).

Chapter 18 of title 19 grants the Governor significant *express powers* to control the *internal* management of banking institutions during the pendency of a banking crisis either by his own action or that of the director of business regulation. Section 19–18–2. However, in spite of being well intentioned, as we are certain the Governor was, his actions in this case seem quite distinct from the executive actions regarding the internal affairs of financial institutions expressly authorized by chapter 18 of title 19. Releasing information so as to secure remedial action by the Legislature does not suspend or restrict banking activities, nor does it regulate internal bank management. Rather the Governor was attempting to secure a result separate and distinct from any power directly granted under chapter 18 of title 19. However well-intentioned his acts may have been, they were clearly beyond the scope of the executive duties *expressly* committed to his care.

To find the Governor's acts were authorized would require us to find them implicitly granted by chapter 18 of title 19. This contention is troublesome because of the scope of implication necessary to support it. Our examination of the statute will not support such a broad construction. Although we do not doubt the Governor's good motives in this matter, we must decline to ascribe to the Legislature an intent to grant his acts the broad authorization that he claims.

The Governor finally contends that if his acts were a violation of the state privacy statute, he should be entitled to "good faith" immunity for his actions. As the Governor contends, good faith immunity has been afforded to government officials accused of civil rights violations by federal courts to protect them from incurring *personal* liability for their official actions. *See generally Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (and cases cited therein). These cases, though not binding on this court in reviewing a Rhode Island statute, may be

---

**18.** Since repealed by P.L.1995, ch. 82, § 20. Similar provisions were enacted as G.L.1956

chapter 13 of title 19.

of persuasive authority. In the case at bar, however, the Governor is being sued in his official, not his personal capacity.

In the case of *Calhoun v. City of Providence*, 120 R.I. 619, 390 A.2d 350 (1978), we considered the interplay of immunity doctrines and the State of Rhode Island's liability for torts under G.L.1956 § 9–31–1. Rejecting a strict application of *respondeat superior* principles, we noted that if the state were to be shielded from liability by extension of the officer's personal immunity, that extension must be justified with respect to the public policies that supported the creation of the official's personal immunity in the first place. *See Calhoun*, 120 R.I. at 630–32, 390 A.2d at 356. In *Calhoun*, because public policy required that judges' activities be engaged in freely and independently and untrammeled by the possibility of disruptive litigation, we held that personal judicial immunity extended to afford the state protection from suits for any acts committed by judges in their official capacity. *Id.* We reasoned that having judges considering the possibility of tort litigation when reaching a decision would undermine important values of judicial independence. *Id.*

■ Although not extensively discussed in our prior cases, it seems beyond doubt that the Governor *may* be entitled to *some form* of common law qualified immunity for his acts performed in good faith. *See Harlow v. Fitzgerald*, 457 U.S. 800, 813–19, 102 S.Ct. 2727, 2736–39, 73 L.Ed.2d 396, 407–411 (1982) (adopting objective test for qualified immunity); *Scheuer*, 416 U.S. at 247–48, 94 S.Ct. at 1692, 40 L.Ed.2d at 103 (good-faith immunity). However, as the issue was neither extensively briefed by the parties nor reached by the trial justice below, we are of the opinion that the determination regarding whether official qualified immunity exists should be left for determination upon remand.

**B**

**G.L.1956 § 19–14–2 and Chapter 2 of Title 38**

■ The depositors additionally cite in support of their position the state Access to Public Records Act, G.L.1956 chapter 2 of title 38 (APRA). The APRA notes that it is "the intent of this chapter to protect from disclosure information about particular individuals maintained in the files of public bodies when disclosure would constitute an unwarranted invasion of personal privacy." Section 38–2–1. Information deemed "not * * * public" and not subject to release includes "financial information obtained from a person * * * which is of a privileged or confidential nature," section 38–2–2(d)(2), and "[r]ecords, reports * * * required to be kept confidential by federal or state law," § 38–2–2(d)(19). The act allows the release of any "reasonably segregable portion * * * after the deletion of the information which is the basis of the exclusion." Section 38–2–2(d)(22).

We conclude from the definition in § 38–2–2(d)(2) and our discussion above that the depositors' bank records were not the sort of information that could have been required to be disclosed pursuant to APRA as "public records." However, the depositors seek not to prevent access to their records but to suggest that the release of any such records in the possession of the state was unlawful.

Although § 38–2–1 proclaims an intent to "protect from disclosure information about particular individuals maintained in the files of public bodies," we have held that this section affords no right to prevent the release of private information. *Rhode Island Federation of Teachers v. Sundlun*, 595 A.2d 799, 800 (R.I.1991). Our holding, based upon a careful analysis of legislative intent and case law decided under the analogous federal Freedom of Information Act (FOIA), that APRA does not contemplate "reverse-FOIA" suits, likewise forecloses the depositors' claims under the act. *Id.* at 802–03.

■ The depositors next advance claims under G.L.1956 § 19–14–2. Section 19–14–2 requires that "[t]he records and information contained in reports of [financial institutions] * * * shall be open only to the inspection of the director [of business regulation] * * * and such other officers of the state as may have occasion and authority to inspect them

in the performance of their duties." The act provides three express remedies for its enforcement. First, the unauthorized release of such information by the director of business regulation is grounds for his or her removal. Second, any deputy or assistant to the director responsible for the unauthorized release of such information *shall* be removed from office by the director. Finally, "any such deputy, assistant, or *officer*, who, except in the discharge of his or her official duty * * * shall impart any such information *shall be* liable for a fine of not exceeding one thousand dollars ($1000)." *Id.* (Emphases added.)

Assuming *arguendo* that the Governor's actions violated the provisions of § 19–14–2, we note that the express language of the statute affords the depositors no personal remedy. To recognize their claims for declaratory and compensatory relief would require this court to imply a private cause of action. In the case at bar we have already determined that a specific remedy exists for legal redress under the provisions of § 9–1–28.1. It is therefore unnecessary and inappropriate for this court to seek or find an implied right of action under § 19–14–2. *See Citizens for Preservation of Waterman Lake v. Davis,* 420 A.2d 53 (R.I.1980) (no implied private remedy for enforcement of provisions of wetlands act).

## IV

### Federal Statutory and Constitutional Claims

Having considered the state law grounds advanced by the depositors, we now reach their federal statutory and constitutional claims. Each will be addressed in turn. However, we must first address a threshold issue in respect to 42 U.S.C. § 1983.

■■■ The Governor asserts that he is not amenable to suit in his official capacity because he is not a person within the contemplation of 42 U.S.C. § 1983.[19] In this contention the Governor is correct. In *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), Justice White, writing for five members of the Court, reasoned that because "Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance * * * we cannot accept [the] argument that Congress intended nevertheless to create a cause of action against States to be brought in state courts, which are precisely the courts Congress sought to allow civil rights claimants to avoid through § 1983." 491 U.S. at 66, 109 S.Ct. at 2310, 105 L.Ed.2d at 55. The Court therefore held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71, 109 S.Ct. at 2312, 105 L.Ed.2d at 58. We are bound by *Will*'s authoritative construction of § 1983. Since the depositors have sued the Governor in his official capacity that portion of the depositors' complaint based upon 42 U.S.C. § 1983 was properly denied by summary judgment.

### A

### Federal Privacy Act of 1974—Public Law 93–579 § 7

■■■ The depositors suggest that an uncodified section of the federal Privacy Act of 1974 prevents the release of their Social Security numbers. Section 7(b) of that act reads,

> "(b) Any Federal, State, or local government agency which requests an individual to disclose his social security account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." Public Law 93–579, 88 Stat. 1896.

---

**19.** 42 U.S.C. § 1983 creates a federal cause of action for violation of federal rights. It reads in part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State * * * subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Even though the act may indicate a congressional intent that Social Security numbers remain confidential, *see, e.g., State ex rel. Beacon Journal Publishing Co. v. City of Akron,* 70 Ohio St.3d 605, 640 N.E.2d 164, 167–68 (1994); *Tribune–Review v. Allegheny County Housing Authority,* 662 A.2d 677, 682 (Pa.Cmwlth.1995), it affords no express retrospective remedies save as against federal agencies. Although Federal District Courts have afforded injunctive relief under § 7(b), *see Yeager v. Hackensack Water Co.,* 615 F.Supp. 1087, 1092 (D.N.J.1985); *Greater Cleveland Welfare Rights Organization v. Bauer,* 462 F.Supp. 1313, 1320 (N.D.Ohio 1978), we have found no precedential authority for the award of remedies other than injunctive relief. As such we conclude that a court may not grant retrospective relief in the form of damages based upon the federal Privacy Act to the depositors.

**B**

**12 U.S.C. § 3401**

 The depositors next rely upon the Right to Financial Privacy Act of 1978 enacted by Congress to restrict access to banking records after the decision in *United States v. Miller, supra, see United States v. Frazin,* 780 F.2d 1461, 1465 (9th Cir.1986) (discussing legislative history). The act, with several exceptions irrelevant to this case, prohibits any "Government authority" from having access to financial records without first procuring a subpoena or summons, 12 U.S.C. § 3402, or the consent of the banking customer, 12 U.S.C. § 3404. A right of action with significant civil penalties is afforded to remedy violations of the act's provisions. *See* 12 U.S.C. § 3417. In spite of the depositors' reliance on these provisions we must point out that the act prohibits access to banking records by "Government authority," a term defined as "any agency or department of the United States, or any officer, employ-

ee, or agent thereof." 12 U.S.C. § 3401. For violations of this statute, civil penalties are authorized against agencies, departments, or employees of the United States or financial institutions by 12 U.S.C. § 3417. The Governor does not fall within any of these categories. *See generally Liffiton v. Keuker,* 850 F.2d 73, 78 (2nd Cir.1988). Consequently depositors fail to state a claim based upon the Right to Financial Privacy Act.

**C**

**Constitutional Claims**

 Last we address the depositors' contentions that the Governor's acts violated their rights to privacy as guaranteed by the United States and Rhode Island Constitutions. For the purposes of this opinion we shall treat the constitutional protections afforded by the Federal and State Constitutions as being of identical scope.[20]

The United States Supreme Court has recognized that "zones of privacy" may be created by specific constitutional guarantees and their penumbrae in order to impose limits upon governmental power. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Supreme Court's prior cases under the rubric of the right to privacy include the intrusion of the criminal justice system upon an individual's privacy. This case recognized zones of privacy into which governmental power could not intrude. *Id.* at 484, 85 S.Ct. at 1681, 14 L.Ed.2d at 514–515. Taken at their furthest expanse, these rights prevent unjustified intrusion by the Government into the " 'area of protected freedoms.' " *Id.* at 485, 85 S.Ct. at 1682, 14 L.Ed.2d at 516; *see also Poe v. Ullman,* 367 U.S. 497, 550, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989, 1023 (1961) (Harlan, J., dissenting) ("Constitution protects the privacy of the

---

**20.** We decline to reach the depositors' suggestion that the Rhode Island Constitution affords additional protection to privacy rights over those afforded under the United States Constitution. Although this court has the power and the right to effectuate a higher level of constitutional safeguards for Rhode Island citizens under our own constitutional provisions than that provided by the United States Constitution, *State v. McGoff,*

517 A.2d 232, 235 (R.I.1986); *State v. Benoit,* 417 A.2d 895, 899 (R.I.1980), *overruled on other grounds by State v. Werner,* 615 A.2d 1010 (R.I. 1992), we shall not reach such contentions absent strict necessity. Such necessity is not shown when other grounds for decision are present on the record as they are in this case. *McGoff,* 517 A.2d at 235; *State v. Berberian,* 80 R.I. 444, 445, 98 A.2d 270, 270–71 (1953).

home against all unreasonable intrusion of whatever character").

Although the Supreme Court has recognized a privacy interest in "avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, 73 (1977), certain cases have addressed the compelled disclosure of information as part of a comprehensive statutory scheme collecting that information. *See, e.g., Nixon v. Administrator of General Services,* 433 U.S. 425, 455–65, 97 S.Ct. 2777, 2797–2801, 53 L.Ed.2d 867, 899–905 (1977); *Whalen,* 429 U.S. at 599 n. 25, 97 S.Ct. at 876 n. 25, 51 L.Ed.2d at 73 n. 25. Both the *Nixon* and the *Whalen* Courts assumed that the information would remain confidential in approving of the collection of the private information at issue. *Nixon v. Administrator of General Services,* 433 U.S. at 465, 97 S.Ct. at 2801, 53 L.Ed.2d at 905; *Whalen v. Roe,* 429 U.S. at 601, 605, 97 S.Ct. at 877, 879, 51 L.Ed.2d at 74–75, 77. The Court has explicitly noted that it has not reached the further issue of the constitutional import of the later disclosure of information collected by the government on matters deemed encompassed within an individual's right to privacy. *Whalen,* 429 U.S. at 605–06, 97 S.Ct. at 879, 51 L.Ed.2d at 77.

In the case at bar the information on the depositors' bank accounts was gathered by the state through constitutional means, as part of a state statutory scheme, and then disclosed. As a result the constitutional violation alleged to have occurred involves the question the *Whalen* Court did not reach, that of the release of information held by the government.

■ However, we are convinced that any *constitutional* right to avoid disclosure of information held in government files based upon the right to privacy must be grounded in a fundamental right clearly tied to a specific constitutional privacy right, the exercise of which would be impeded by the release of such information. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (political association rights); *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (right to seek medical care).

■ In the case at bar *United States v. Miller, supra,* has conclusively determined that the contents of banking records do not implicate any such fundamental constitutional right. Therefore, we hold that the depositors have not stated a constitutional claim because revealing the contents of an individual's banking records does not interfere with the exercise of fundamental rights.[21]

## V

### Depositors' Motion for Summary Judgment

As we have indicated above, the depositors' claim pursuant to § 9–1–28.1 requires the proof of facts relating to the elements of publication of private facts and the offensiveness of the material published. Since these elements of material fact have not and cannot be resolved by the pleadings or other materials presently in the record, the trial justice properly denied the depositors' motion for summary judgment.

## VI

### Conclusion

Because we have concluded that the depositors have raised issues of material fact in respect to their claim brought pursuant to § 9–1–28.1, we sustain their appeal in part from the entry of summary judgment in favor of the Governor. We deny and dismiss the depositors' appeal from the entry of summary judgment in respect to their claim pursuant to an alleged violation of chapter 2 of title 38 and § 19–14–2. We deny and dismiss their appeal from the summary judgment in favor of the Governor in respect to their

---

21. The depositors rely heavily upon the Supreme Court of Ohio's determination in *State ex rel. Beacon Journal Publishing Co. v. City of Akron,* 70 Ohio St.3d 605, 640 N.E.2d 164 (1994), that Social Security numbers were constitutionally protected. We must respectfully disagree with that court that the possible consequences of misuse of Social Security numbers impinges on or would restrict the exercise of fundamental rights, as we have described them, so as to make their release a matter of substantive constitutional import.

federal statutory and constitutional claims. We remand the papers in the case to the Superior Court for a trial on the merits of the allegations concerning violation of § 9–1–28.1 in which the court may determine whether all elements of the action for deprivation of the right to privacy have been established, including the element concerning whether the fact made public was one that would be "offensive or objectionable to a reasonable man of ordinary sensibilities."

GOLDBERG, J., did not participate.