April 20, 2023

**Supreme Court**

No. 2021-267-Appeal.
(PC 07-6702)

William Felkner                    :

v.                    :

Rhode Island College et al.                    :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 or Email opinionanalyst@courts.ri.gov  of  any  typographical  or other formal errors in order that corrections may be made before the opinion is published.

William Felkner          :

v.                       :

Rhode Island College et al.    :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Lynch Prata, for the Court.**  This case came before the Supreme

Court on December 6, 2022, on appeal by the plaintiff, William Felkner (Felkner or

plaintiff), from entry of summary judgment in favor of the defendants, Rhode Island

College (RIC), John Nazarian (Nazarian), Carol Bennett-Speight (Dean Bennett-

Speight), James Ryczek (Professor Ryczek), Roberta Pearlmutter (Professor

Pearlmutter), and S. Scott Mueller (Professor Mueller), (collectively, defendants).[1]

Before this Court, the plaintiff argues that the hearing justice erred in granting

---

[1] More specifically, defendants are: John Nazarian, President of RIC at the time Felkner was enrolled at the School of Social Work (SSW); Carol Bennett-Speight, Dean of the SSW at relevant times; James Ryczek, an adjunct professor at the SSW at relevant times; Roberta Pearlmutter, a professor of social work at the SSW at relevant times; and S. Scott Mueller, an assistant professor of social work at the SSW at relevant times. *Felkner v. Rhode Island College*, 203 A.3d 433, 440 n.2 (R.I. 2019) (*Felkner I*).

summary judgment on the grounds of qualified immunity. The plaintiff also contends that the hearing justice disregarded this Court's mandate when the case was remanded to the Superior Court. Finally, the plaintiff argues that the hearing justice improperly resolved questions of material fact in granting summary judgment. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## Facts and Travel

This is not the first time Felkner has appeared before this Court. A full rendition of the original facts and travel can be found at *Felkner v. Rhode Island College*, 203 A.3d 433 (R.I. 2019) (*Felkner I*). We will, however, recite the facts and travel pertinent to the instant appeal. Felkner, who describes himself as a "conservative libertarian," began pursuit of a Master of Social Work degree at RIC in 2004. Shortly thereafter, he learned that the School of Social Work (the SSW) would be sponsoring a showing of the movie *Fahrenheit 9/11*.[2] Felkner objected to the showing of the film to Professor Ryczek, his instructor for a foundational course, and requested that the SSW show a rebuttal film that represented the conservative view-point. Professor Ryczek responded that the SSW has a mission dedicated to social and economic justice and suggested that:

---

[2] *Fahrenheit 9/11* is a documentary film written and directed by filmmaker, author, and political commentator Michael Moore that takes a liberal, critical look at the presidency of George W. Bush, the war in Iraq, and its coverage in the media. *Fahrenheit 9/11* (Michael Moore 2004).

"[I]f a student finds that they are consistently and regularly experiencing opposite views from what is being taught and espoused in the curriculum, or the professional 'norms' that keep coming up in class and in field, then their fit with the profession will not get any more comfortable, and in fact will most likely become increasingly uncomfortable."

The sponsor of the film presentation, Professor Daniel Weisman (Professor Weisman), responded to Felkner that the SSW was "not committed to balanced presentations" and that, "[f]or the most part, Republican ideology is oppositional" to the fundamental values of the social work profession. Nevertheless, Professor Weisman did show the rebuttal film suggested by Felkner to the same classes that saw the first film because he felt it was "the reasonable thing to do."

In Professor Ryczek's course, students were assigned a group project in which they were to advocate for a social welfare issue in class and compose a policy paper promoting the group's position. According to Felkner, Professor Ryczek provided a list of issues the students could choose from, all of which involved, in Felkner's words, "a leftist position on social welfare issues." Professor Ryczek indicated that the students would advocate on behalf of their selected issue and lobby the General Assembly in the next semester's course. Felkner joined a class group advocating for passage of Senate Bill 525 (SB 525), a proposed amendment to a "temporary cash assistance program for Rhode Islanders having a difficult time making ends meet." Felkner later requested permission from Professor Ryczek to advocate in opposition to SB 525 in the class debate because, according to Felkner, "SB 525 did not actually

help people get off welfare with higher-paying jobs * * *." Professor Ryczek refused to allow Felkner to change his debate position and required Felkner to argue in favor of SB 525. According to Felkner, Professor Ryczek told him that RIC was a "perspective school" and that if Felkner was to lobby on SB 525, it would need to be "in [RIC's] perspective."[3] Additionally, Felkner wrote his policy paper from a perspective opposing the passage of SB 525.

After complaints from group members that Felkner was not participating in accordance with class expectations, Professor Ryzcek disaggregated Felkner's grade from the group. He went on to give Felkner a failing grade for the debate and on his paper, and ultimately gave Felkner a C-plus grade for the course. Felkner appealed his failing grades for the paper and the debate to the Academic Standing Committee (ASC).

On January 20, 2005, a hearing was held before the ASC on Felkner's appeal of his grades. According to Felkner, he did not have the opportunity to question Professor Ryczek at the hearing because Professor Ryczek left the room immediately after his testimony. Felkner believed that Professor Ryczek had given inaccurate testimony to the ASC regarding conversations between them and announced that he

---

[3] This issue was ultimately resolved as stated in *Felkner I*: "There is no dispute that, although Professor Ryczek initially told Felkner he would be required to lobby from a perspective contrary to his own views, Felkner never was compelled to lobby or testify at a public hearing." *Felkner I*, 203 A.3d at 452.

would hereafter record all of his conversations with RIC professors in order to document them accurately. The ASC denied Felkner's appeal, and he further pursued the case to the chair of the Master of Social Work (MSW) program, Dr. Lenore Olsen, and then to the dean of the SSW, Dean Bennett-Speight.

The decision of the ASC was upheld in both instances. Felkner approached the Foundation for Individual Rights in Education (FIRE)[4] about his alleged mistreatment. RIC's then-President, Nazarian, received a letter from FIRE, dated January 28, 2005, stating that RIC should reconsider the appeal and withdraw its policies because they are unconstitutional. In a letter, Nazarian replied to FIRE that no RIC student had been punished for failing to embrace a certain political position.

At the end of the course, Professor Ryczek informed Dr. Olsen that he would not teach the second half of the class the next semester because, as an adjunct faculty member, managing Felkner required too much of his time. Felkner was moved to a section of the course taught by a full-time instructor. In an assignment that required approval by Professor Pearlmutter, Felkner proposed that he would form a group with students from other colleges to lobby RIC for an Academic Bill of Rights.

---

[4] FIRE describes itself as a tax-exempt nonprofit organization under Section 501(c)(3) of the Internal Revenue Code with a mission to defend and promote the value of free speech for all Americans in courtrooms, on campuses, and in American culture. FIRE's Mission, https://www.thefire.org/about-us/mission (last visited December 15, 2022). FIRE has since modified its name to the Foundation for Individual Rights and Expression.

Professor Pearlmutter rejected this proposal. Felkner then submitted a project request to lobby in favor of the then-governor's proposed welfare-reform program. This suggestion was also rejected.

Subsequently, Professor Pearlmutter permitted Felkner to work on a project lobbying for the defeat of SB 525. Professor Pearlmutter told Felkner that she would penalize his grade on the project if he did not work on it with students from her class. Felkner, however, chose to work in a group with two individuals from outside of RIC.[5] Additionally, Felkner audio-recorded an exchange with Professor Pearlmutter without her knowledge and went on to post a rough transcript of the conversation to the website he had created to expose what he characterized as the "liberal bias" at RIC. Several students approached Professor Pearlmutter about the confidentiality of the class being compromised by Felkner's website postings. She allowed students to discuss their concerns about the website one day in class. Felkner asserted that his political ideology was "assail[ed]" in the classroom and that Professor Pearlmutter would not give him the opportunity to respond. Felkner further asserted that Professor Pearlmutter unmistakably communicated that only liberal ideas could help the poor and advance the cause of social justice.

---

[5] Felkner partnered with a student from Brown University and a local talk radio personality.

Professor Pearlmutter filed a complaint with the ASC, asserting that Felkner violated the National Association of Social Workers (NASW) Code of Ethics. On April 27, 2005, the ASC held a hearing on Professor Pearlmutter's complaint, that Felkner committed unethical and unprofessional conduct. Thereafter, the ASC issued a written decision determining that Felkner's deceptive conduct in recording his conversation with Professor Pearlmutter violated one of the three sections of the Code of Ethics alleged by Professor Pearlmutter in her complaint. The ASC recommended that Felkner declare immediately, in writing, that he would refrain from any deceptive audio or video copying of conversations with social work colleagues and refrain from any audio or video copying without express permission. The ASC further advised that Felkner be dismissed from the MSW program if he failed to carry out such a declaration. Felkner wrote a letter to Dean Bennett-Speight, dated May 11, 2005, indicating that he would refrain from making audio or video recordings of his conversations with his SSW colleagues unless he first obtained their consent to record.

At the end of the spring semester, Felkner selected the Social Work Organizing and Policy (SWOP) concentration for completion of his degree. As a MSW student, Felkner was required to complete a field placement and integrative project in order to fulfill the program requirements. For Felkner's field placement and integrative project, he obtained an internship in then-Governor Donald L.

Carcieri's office, assigned to welfare-reform legislation. Felkner alleged that Professor Ryczek, who coordinated field placements, denied Felkner's placement because it would not promote progressive social change. Felkner claimed that Professor Ryczek informed him that the SWOP-concentration objectives required him to defend liberal policies and that Felkner's views might be best served in another academic discipline, such as political science. Felkner met with Dean Bennett-Speight about his challenges in the SWOP-concentration field placement process, claiming he was singled out because of his conservative views. Thereafter, Dean Bennett-Speight assigned Professor Mueller to be Felkner's field placement supervisor. Professor Mueller initially rejected Felkner's proposed field placement and project, but eventually RIC approved the field placement in the Governor's office.

According to Felkner, Professor Mueller refused to authorize Felkner's submission of an integrative project on welfare reform because it was a "toxic" subject. Felkner reluctantly conceded to initiate work on health care. Felkner alleged that working on health-care reform put him at a disadvantage relative to other SSW students because he was unable to use his field placement research for his integrative project. Felkner worked on his integrative project throughout 2006 and 2007. On November 26, 2007, Felkner requested more time to complete his integrative project. In January 2008, Dean Bennett-Speight granted Felkner an extension until May 11,

2009, to complete his degree requirements. The extension was subject to Felkner submitting a section of the project by April 15, 2008, a requirement with which he did not comply. On March 17, 2008, Felkner sought an additional six-week extension, but both Professor Pearlmutter and Dean Bennett-Speight denied this request.

In December 2007, Felkner filed the instant action in Providence County Superior Court, alleging multiple violations of the Rhode Island and United States constitutions. Felkner sought equitable relief and damages under 42 U.S.C. § 1983 and § 1988, alleging that defendants' conduct toward him during his enrollment in the MSW program violated his First and Fourteenth Amendment rights.[6] Summary judgment was entered on November 4, 2015, which was then appealed to this Court. In *Felkner I*, the Court affirmed summary judgment on claims of retaliation based on recording activities; equal protection; procedural due process; and civil conspiracy pursuant to 42 U.S.C. § 1985(3). *Felkner I*, 203 A.3d at 452, 456, 458, 460. The Court further affirmed the order granting a motion to strike plaintiff's

---

[6] This Court stated in *Felkner I*, "Felkner has not drawn this Court's attention to any distinction between the application of Rhode Island and federal law regarding his free speech and expression, equal protection, and due process claims. Therefore, we address only the application of federal law to these claims." *Felkner I*, 203 A.3d at 446 n.9.

claim for punitive damages.[7] *Id.* at 461. This Court vacated the judgment as to claims for violation of Felkner's First Amendment free-speech and expression rights based on political viewpoint; retaliation for exercising his First Amendment rights, other than those related to recording; compelled speech contrary to his political beliefs; and the imposition of unconstitutional conditions for obtaining his Master's degree. *Id.* at 450, 452-53, 462. Additionally, the Court noted that the hearing justice had not addressed defendants' qualified immunity arguments. *Id.* at 460. Specifically, the Court stated, "[p]art of the Superior Court's task on remand will be, therefore, to consider whether any of the defendants are entitled to qualified immunity, should defendants continue to press this argument." *Id.* Subsequently, in October 2019, defendants filed a motion for summary judgment based on qualified immunity.

After written memoranda from the parties, supplemental briefing, and a hearing on the issue of qualified immunity, the hearing justice issued a written decision on defendants' motion for summary judgment. She applied a two-step analysis and determined that it was uncontested that Felkner met the first step of a qualified immunity claim, having alleged the deprivation of an actual constitutional right; thus, the hearing justice proceeded to the first aspect of the second step of the

---

[7] In *Felkner I*, this Court also determined that all claims pursuant to the Rhode Island Civil Rights Act, G.L. 1956 chapter 112 of title 42 ("RICRA"), and claims for equitable relief were waived. *Felkner I*, 203 A.3d at 446 n.10.

- 10 -

analysis. The hearing justice concluded that defendants' actions had not been clearly established as constitutional violations during the relevant time frame and that the relevant caselaw favored the concept that courts should not intrude into purely academic matters and should defer to educators. Therefore, she found, the second step was not satisfied.

With regard to the second aspect of the second step, the hearing justice proceeded to opine on whether a reasonable defendant would have understood that his or her conduct violated Felkner's constitutional rights. She determined that, at the time of the alleged violations, the law was not clear on the subject matter of Felkner's allegations and that, therefore, a reasonable defendant would not have had fair warning that Felkner's constitutional rights might be violated by their decisions.

Upon a finding that defendants were entitled to qualified immunity, the hearing justice granted summary judgment in favor of defendants. Felkner thereafter filed a notice of appeal.[8]

## Standard of Review

"This Court reviews a decision granting a party's motion for summary judgment *de novo*." *Citizens Bank, N.A. v. Palermo*, 247 A.3d 131, 133 (R.I. 2021)

---

[8] Felkner filed a premature notice of appeal on September 20, 2021; final judgment was entered on October 12, 2021. Therefore, we will treat the appeal as timely. *See Goddard v. APG Security-RI, LLC*, 134 A.3d 173, 175 (R.I. 2016) (treating a premature notice of appeal as timely filed).

- 11 -

(quoting *Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 598 (R.I. 2019)). We assess the matter "from the vantage point of the trial justice[,] * * * view[ing] the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, we will affirm * * *" *Id.* (quoting *Boudreau*, 212 A.3d at 598). "Although summary judgment is recognized as an extreme remedy, * * * to avoid summary judgment the burden is on the nonmoving party to produce competent evidence that proves the existence of a disputed issue of material fact." *Id.* (quoting *Boudreau*, 212 A.3d at 598).

**Discussion**

On appeal, Felkner argues that the hearing justice violated the law of the case by exceeding this Court's mandate on remand. Felkner asserts that the hearing justice found that defendants had not violated Felkner's constitutional rights, in direct contravention of this Court's decision. Felkner also maintains that defendants are not entitled to qualified immunity as a matter of law. Further, Felkner argues that qualified immunity does not apply to his request for equitable relief and that defendants are not entitled to qualified immunity because Felkner's constitutional rights were established by caselaw. Felkner also maintains that defendants' insurance coverage precludes the application of qualified immunity. Finally,

- 12 -

Felkner suggests that the hearing justice impermissibly resolved questions of material fact.

In response, defendants argue, *inter alia*, that the hearing justice correctly decided that the law was not clearly established as to the alleged constitutional violation. According to defendants, the facts presented by Felkner did not support his assertion that defendants violated a clearly established right, and, therefore, defendants were not given fair warning that they were acting in an unconstitutional manner.

Qualified immunity is an immunity typically afforded to government officials on the federal level. *Ensey v. Culhane*, 727 A.2d 687, 690 (R.I. 1999). The United States Supreme Court has stated that "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). This Court has acknowledged that the defense of qualified immunity may be

available in some circumstances. Specifically, former Chief Justice Weisberger wrote, "[w]e are of the opinion that, in an appropriate case, the doctrine of qualified immunity might well be applied by this Court." *Ensey*, 727 A.2d at 690. We deem it applicable to the claims remaining in this case.

In a qualified-immunity analysis, "the first step in evaluating a claim * * * is to 'determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'" *Monahan v. Girouard*, 911 A.2d 666, 674 (R.I. 2006) (deletion omitted) (quoting *Wilson*, 526 U.S. at 609). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A clearly established constitutional right "means that, at the time of the [official's] conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *al-Kidd*, 563 U.S. at 741)). If the answer to the second question is also yes, then the Court must determine the second aspect of the second step, whether a reasonable official, situated similarly to the defendants, would have understood that the conduct at issue, if proven, contravened the clearly established law. *See Saucier*, 533 U.S. at 202. The determination of whether defendants may avail themselves of qualified immunity considers the conduct in

- 14 -

question from the perspective of "objective reasonableness." *See Malley v. Briggs*, 475 U.S. 335, 344 (1986).

It is undisputed by the parties, and it was recognized by the hearing justice, that the first step in the qualified-immunity analysis was satisfied by Felkner when he alleged that his First Amendment right to free speech was violated. Therefore, we must determine whether the rights at issue were clearly established at the time of defendants' alleged misconduct.

The United States Supreme Court has created certain benchmarks concerning First Amendment rights in academia as they relate to students and to educational institutions. *See Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514 (1969) (ruling that the school could not preclude students from wearing black armbands in class to demonstrate against the Vietnam War); *see also Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that schools may restrict students' First Amendment rights by exercising editorial power "so long as [the schools'] actions are reasonably related to legitimate pedagogical concerns"); *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682-83 (1986) (noting that students have First Amendment free-speech rights, but that schools may limit speech that is "lewd, indecent, or offensive")

This Court noted in *Felkner I* that, while freedom of speech is vital in American classrooms, "[r]ights guaranteed by the First Amendment, however, are

not unlimited in the context of academia." *Felkner I*, 203 A.3d at 448 (citing *Hazelwood*, 484 U.S. at 273). This Court went on to note that, under *Hazelwood*, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* (quoting *Hazelwood*, 484 U.S. at 273).

Generally, academic decisions concerning grades, coursework, and progress within an academic program are accorded great deference and are not subject to judicial review. *See Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 89-90 (1978). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 96 n.6 (Powell, J., concurring). Furthermore, courts "should show great respect for the faculty's professional judgment. Plainly, [courts] may not override [professional judgment] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Felkner I*, 203 A.3d at 449 (quoting *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225 (1985)).

The Supreme Court has stated that "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they

- 16 -

exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Thus, the precedent encompassing academic decisions by public institutions, including *Horowitz*, *Hazelwood*, *Ewing*, and *Fraser*, convinces us that the law was not sufficiently clear, such that a reasonable educator would have understood what they were doing amounted to violations of a student's constitutional rights. *See Wesby*, 138 S. Ct. at 589. The core of Felkner's argument is that he was not allowed to complete Master's-level assignments on topics he chose, as opposed to the topics that were assigned to him. Further, that when he pursued his chosen topic against the wishes of the faculty, he was retaliated against with poor grades. To expect faculty to decipher "a sufficiently clear foundation in then-existing precedent" would be improper. *Wesby*, 138 S. Ct. at 589. Felkner failed to show that the law is clearly established; furthermore, a reasonable person in defendants' position would not have had fair warning that their conduct potentially violated his constitutional rights. *See Saucier*, 533 U.S. at 202. We decline to disturb the findings of the hearing justice.

Felkner argues that there are active claims against RIC, for which the defense of qualified immunity cannot be raised. This Court determined that all claims pursuant to the Rhode Island Civil Rights Act, G.L. 1956 chapter 112 of title 42 ("RICRA") and for equitable relief were waived. *Felkner I*, 203 A.3d at 446 n.10.

- 17 -

The only claims against RIC in the amended complaint were for equitable relief. Accordingly, no claims against RIC remain as an institution because RIC is not a person, pursuant to § 1983. "This Court has recognized that 'neither a State nor its officials acting in their official capacities are "persons" under § 1983.'" *Zab v. Rhode Island Department of Corrections*, 269 A.3d 741, 746 (R.I. 2022) (quoting *Pontbriand v. Sundlun*, 699 A.2d 856, 868 (R.I. 1997)). Therefore, only the § 1983 claims against the individual defendants remained.

Lastly, Felkner's contention that the existence of insurance coverage for defendants precludes the application of qualified immunity is without merit. This argument is not supported by caselaw and is inconsistent with the underpinnings of qualified immunity. *Harlow*, 457 U.S. at 814, 818 (noting that qualified immunity strikes a balance between the need to vindicate constitutional harms and social costs associated with bringing suit against government officials.).[9]

## Conclusion

For the reasons stated herein, we affirm the final judgment of the Superior Court. The papers in this case shall be returned to the Superior Court.

---

[9] Felkner submitted citations of supplemental authorities and defendants submitted a response after oral argument pursuant to Article I, Rule 16(e) of the Supreme Court Rules of Appellate Procedure. We acknowledge receipt of those authorities; however, it has not impacted our analysis.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | William Felkner v. Rhode Island College et al. |
| **Case Number** | No. 2021-267-Appeal.<br>(PC 07-6702) |
| **Date Opinion Filed** | April 20, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Erin Lynch Prata |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Susan E. McGuirl |
| **Attorney(s) on Appeal** | For Plaintiff:<br><br>Thomas W. Lyons, Esq.<br>For Defendants:<br><br>Jeffrey S. Michaelson, Esq. |