DECISION
Beverly Haviland (Plaintiff or Haviland), a Senior Lecturer in the Department of American Civilization at Brown University, has filed a three count complaint against Brown University (Defendant or Brown or the University) and its current President, Ruth Simmons (President Simmons) regarding her employment.[1] Count I alleges a breach of an employment agreement between Plaintiff and Brown. Count II alleges a claim of promissory estoppel.[2] Count III requests a Declaratory Judgment under the Uniform Declaratory Judgments Act, chapter 30 of title 9 of the Rhode Island General Laws. As to Count III for declaratory relief, the Defendant has moved for dismissal as a matter of law arguing that the Plaintiff has failed to allege a justiciable controversy. *Page 2 
As to all counts, Plaintiff claimed a trial by jury, but at the commencement of trial waived her jury trial claim.[3] This Court will preliminarily resolve the issue of justiciability, which raises a question of this Court's subject matter jurisdiction under the Declaratory Judgments Act.
 Jurisdictional Analysis
A declaratory judgment "is neither an action at law nor a suit in equity but a novel statutory proceeding. . . ." Northern TrustCo. v. Zoning Bd. Of Review of Town of Westerly,899 A.2d 517, 520, n. 6 (R.I. 2006) (quoting Newport AmusementCo. v. Maher, 92 R.I. 51, 53, 166 A.2d 216, 217 (1960)). Our Supreme Court recognizes that the Uniform Declaratory Judgments Act ("UDJA") "vests the Superior Court with the `power to declare rights, status and other legal relations whether or not further relief is or could be claimed.'" Malachowski v. State of RhodeIsland, 877 A.2d 649 (R.I. 2005) (citations omitted) (quoting § 9-30-1); see also Sullivan v. Chafee,703 A.2d 748, 751 (R.I. 1997) (stating that trial court's "decision to grant or to deny declaratory relief under the [UDJA] is purely discretionary . . ."). This power is to be liberally construed, "to allow the trial justice to `facilitate the termination of controversies.'" Bradford Associates v. Rhode Island Division ofPurchases, 772 A.2d 485, 489 (R.I. 2001) (quoting CapitalProperties, Inc. v. State, 749 A.2d 1069, 1080 (R.I. 1999)).
The UDJA "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies." Padre v. ConsumerPortfolio Services, Inc., 344 F.Supp.2d 823 (D.R.I. 2004) *Page 3 
(quoting El Diaz, Inc. v. Hernandez Colon,963 F.2d 488, 493 (1st Cir. 1992)). Thus, the purpose of a declaratory judgment action "is to render disputes concerning the legal rights and duties of parties justiciable without proof of a wrong committed by one party against another, and thus facilitate the termination of controversies." Millet v. Hoisting Engineers'Licensing Division of the Dept. of Labor,119 R.I. 285, 377 A.2d 229 (R.I. 1977) (citing 1 Anderson,Actions for DeclaratoryJudgments § 4 (2d ed. 1951) (citations omitted). Such a purpose of the UDJA is valuable in that "it is designed to enable litigants to clarify legal rights and obligations before acting upon them."Ernst Young v. Depositors Economic Protection Corp.,45 F.3d 530 (1st Cir. 1995).
With these principles in mind, however, the Court understands that limitations exist as to the proper invocation of jurisdiction for a claim for declaratory relief. For instance, "[a] declaratory judgment action may not be used for the determination of abstract questions or the rendering of advisory opinions, nor does it license litigants to fish in judicial ponds for legal advice."Sullivan,703 A.2d at 751 (internal citation and quotations omitted). However, the UDJA specifically affords "[a]ny person interested under a deed, will, written contract or other writings constituting a contract . . ." to have "determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder." Section 9-30-2. This case presents such an issue.
In this case, the Plaintiff and the Defendant are alleged to be parties to a contractual employment relationship. The formation of the employment agreement and the determination of its terms and conditions are the subject matter of this dispute.[4] The Plaintiff alleges that at least one term of the agreement, under which she had been hired, *Page 4 
was not followed by the University. The challenged action brings to the Court resolution of a dispute relative to the standards used by the Defendant in 2004 and 2009 when the Tenure, Promotion and Appointment Committee ("TPAC") of Brown University considered her reappointment. The Plaintiff alleges the standards used by the University in considering her reappointment to the faculty were other than what was agreed to, and she is therefore uncertain as to the standards that will be used in the future. Specifically, the Plaintiff maintains that she bargained for a reappointment and renewal term that would afford her job security and is now uncertain as to whether her future reappointments will be considered under the agreed criteria. Thus the Plaintiff has alleged a breach of contract and an invasion of her legally protected interest.
The threshold determination when confronted with a claim under the UDJA is whether the Court is presented with "an actual [justiciable] case or controversy." N M Properties, LLC v. Townof West Warwick, 964 A.2d 1141 (R.I. 2009); see also Bowen v.Mollis, 945 A.2d 314, 317 (R.I. 2008). "For a claim to be justiciable, two elemental components must be present: a plaintiff must have the requisite standing and `some legal hypothesis which will entitle the plaintiff to real and articulable relief.'"N M Properties, 964 A.2d at 1145 (quoting McKenna v.Williams, 874 A.2d 217, 226 R.I. 2005)). To ascertain whether a plaintiff has standing to sue, the court must focus "on the party who is advancing the claim rather than on the issue the party seeks to have adjudicated." Bowen, 945 A.2d at 317. Certainly, "the party seeking relief must have `alleged a personal stake in the outcome of the controversy. . . ." McKenna,874 A.2d at 225 (quoting Flast v. Cohen, 392 U.S.83, 99, 88 S.Ct. 1942 (1968)). *Page 5 
The second requirement for justiciability is that "the facts postulated yield to some conceivable legal hypothesis which will entitle the plaintiff to some relief against the defendant."N M Properties, 964 A.2d at 1145; Goodyear LoanCo. v. Little,107 R.I. 629, 631, 269 A.2d 542, 542 (1970) (citing 1 Anderson § 14 at 59). The UDJA is operative only in respect to a live controversy, meaning "a difference between the parties concerned, as to their legal rights, and that such differences have reached the stage of antagonistic claims, which are being actively pressed on one side and opposed on the other."Id. § 14 at 61. "Where a concrete issue is present and there is a definite assertion of legal rights coupled with a claim of a positive legal duty with respect thereto which is likely to be denied by adverse party, then there is a justiciable controversy calling for the invocation of the declaratory judgment action."N M Properties, 964 A.2d at 1145 (quoting 1 Anderson § 14 at 62).
The necessary standing exists when the plaintiff has suffered "some injury in fact, economic or otherwise." Bowen,945 A.2d at 317; Meyer v. City of Newport,844 A.2d 148, 151 (R.I. 2004). Our Supreme Court has defined injury in fact as "an invasion of a legally protected interest which is concrete and particularized . . . and . . . actual or imminent, not `conjectural' or `hypothetical.'" Pontbriand v. Sundlun,699 A.2d 856, 862 (R.I. 1997) (quoting Lujan v. Defenders ofWildlife, 504 U.S. 555, 560, 112 S.Ct. 2130 (1992)). Additionally, when deciding the issue of standing, this Court recognizes "the importance of the personal nature of a plaintiff's injury and . . . [understands] that a plaintiff must `demonstrate a personalized injury distinct from that of the community as a whole.'" N M Properties, 964 A.2d at 1145 (quotingMeyer, 844 A.2d at 151). *Page 6 
As to standing, the Plaintiff alleges that the application of renewal terms other than those contained in her employment agreement has caused her an injury in fact. Specifically, this Court finds from the evidence presented that the Defendant's alleged failure to abide by the promised protections has led to ongoing uncertainty with regard to Plaintiff's future employment. Here, the University suggests that because the Plaintiff remains on the faculty of Brown, due to reappointments in 2004 and 2009, see infra, there is no injury in fact to justify jurisdiction of this Court.
However, the injury to the Plaintiff is not current unemployment, but the uncertainty as to the standard to be applied in connection with review by the University regarding future reappointments.See Section 9-30-12 (The purpose of the UDJA "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations"). Under the language articulated by our Supreme Court, the Plaintiff's injury is "concrete and particularized." Pontbriand, 699 A.2d at 862. The Court finds that the Plaintiff would not have accepted the Defendant's employment offer without the security provisions she bargained for and received. However, this Court finds from the evidence presented that the Plaintiff's uncertainty as to Defendant's willingness to apply the standard to future employment consideration, not shared by other non-tenured members of the faculty, was bargained for and negotiated prior to the commencement of her employment with Defendant. Pontbriand, 699 A.2d at 862.
The Defendant asserts that the Plaintiff's injury is "conjectural" or "hypothetical." However, the harm of which Plaintiff complains is not "unfounded anxiety or vague fear based on utterly speculative hypotheses." McKenna, 874 A.2d at 227. It is alleged that *Page 7 
the Defendant has already failed on two occasions to adhere to the agreed standard in connection with the Plaintiff's employment renewal in 2004 and 2009.
The Defendant further suggests that the matter fails to satisfy standing requirements because the Plaintiff may not choose to seek renewal of her employment agreement at the conclusion of her current term, and therefore, she has not suffered, and may not suffer in the future, an economic injury. Thus the Defendant argues that the Plaintiff's case is moot.
The Court disagrees. "A case is moot if it raised a justiciable controversy at the time the complaint was filed, but events occurring after the filing have deprived the litigant of an ongoing stake in the controversy." City of Cranston v. R.I. Laborers'Dist. Council, Local 1033, 960 A.2d 529, 533 (R.I. 2008). Plaintiff's case is not moot because her injury in fact is the ongoing uncertainty with respect to her protected contractual rights. In the case of the Plaintiff, it is alleged that the University once again failed to honor its commitment with regard to the 2009 renewal review. Even though the Plaintiff remains a member of the Brown faculty, the underlying dispute concerning the renewal standard has not been settled; thus the Court's judgment would have "a practical effect on the existing controversy." See In reNew England Gas Co., 842 A.2d 545, 554 (R.I. 2004) (concluding that because the underlying labor dispute had settled, the company no longer had a continuing stake in the controversy, thereby rendering the case moot). In the present case, the underlying dispute over the Plaintiff's employment agreement has not been settled. Thus her case is ripe for adjudication. As the purpose of the UDJA "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, *Page 8 
and other legal relations," § 9-30-12, without question, the Plaintiff has an ongoing personal stake in the outcome of this controversy.
Additionally, the Defendant suggests that the Plaintiff's alleged injury took place in the past and thus "does not support a finding of . . . [an existing] case or controversy when the only relief sought is a declaratory judgment" with respect to future conduct.Shotz v. Cates,256 F.3d 1077, 1082 (11th Cir. 2001) (quotingMalowney v. Federal Collection Deposit Group,193 F.2d 1342, 1348 (11th Cir. 1999)). The University believes that neither a past injury nor a present concern of future harm constitutes a legally sufficient injury to confer standing on the Plaintiff. This case is not grounded on a conjectural future injury, but rather presents a live and justiciable issue, based upon the Plaintiff's objectively reasonable fear of Defendant's conduct.Cf. Hakim v. Chertoff, 447 F.Supp.2d 325, 328 (S.D.N.Y. 2006) (concluding that the likelihood of injury — to the plaintiff's freedom of religious exercise by his employer's photograph requirements — was remote at best because there was a specific entry made in his personnel file plainly indicating that his employer had no present intention of requiring the plaintiff to remove his religious headgear). In the present case, however, the Plaintiff provided abundant evidence showing that the University has no intention of applying the renewal terms that Plaintiff alleges were agreed to.
In this case, the Court finds that the Plaintiff's claim involves a present harm, not a future harm. The present harm is the uncertainty based upon the Plaintiff's objectively reasonable belief that the University will continue in its failure to honor the negotiated terms of her employment. "It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective [or unfounded] apprehensions." *Page 9 Chertoff, 447 F.Supp.2d at 328 (quoting City of LosAngeles v. Lyons,461 U.S. 95, 107 n. 8, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). (Emphasis in original.)) The uncertainty and insecurity as to her employment and the terms governing its renewal present "a real and immediate threat" to the Plaintiff.[5] Id.; see Baur v.Veneman, 352 F.3d 625, 636 n. 11 (2d Cir. 2003) (holding that the plaintiff must "allege that he faces a direct risk of harm which rises above mere conjecture"). Moreover, it is clear to this Court that the Plaintiff's injury is personal in nature and entirely distinct from any alleged injury to the community as a whole.Meyer, 844 A.2d at 151.
Under the UDJA, the purpose of declaratory actions is "to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations. . . ." Sec. 9-30-12. Additionally, the UDJA provides that "[a] contract may be construed either before or after there has been a breach thereof." Sec. 9-30-3. Under the Defendant's construction of the employment agreement, the University would have the Plaintiff "wait and see" if Brown again considers her reappointment under standards which she believes are not applicable. The UDJA does not require such a construct.
The Plaintiff is seeking a declaration that the security promised by the University, regarding "adequate cause for non-renewal," is a valid term of her employment agreement that is fully enforceable against the Defendant. As considered by the Court infra, the Court believes there is jurisdiction to afford the Plaintiff the declaratory relief requested. The facts established at trial constitute a sufficient concrete controversy premised upon uncertainty that became manifest in the course of recent renewal considerations. Accordingly, this Court possesses jurisdiction to "afford relief [to the *Page 10 
Plaintiff] from uncertainty and insecurity with respect to rights, status and other legal relations." Sec. 9-30-12.
"If there is a contract between the parties from which springs the rights and liabilities and this situation gives rise to controversy between them antagonistic and real in character, then the case is one in which it is proper for the court to intervene at the instance of the plaintiff, by granting declaratory relief." 1 Anderson § 14 at 65. This Court must reiterate that "[s]tanding is an access barrier that calls for the assessment of one's credentials to bring suit." McKenna, 874 A.2d at 226, 227 (quotingBlackstone Valley Chamber of Commerce v. Public UtilitiesCommission, 452 A.2d 931, 932 (R.I. 1982)). This Court concludes that in this case, the access barrier does not exist, and Plaintiff has properly invoked the Superior Court's subject matter jurisdiction. Accordingly, the University's threshold motion for judgment as a matter of law must be denied.
Having determined that this Court has jurisdiction to hear and determine a justiciable declaratory claim, the Court will now proceed to state its findings of fact and conclusions of law and proceed to determine the merits of Plaintiff's claim under Count III of the complaint.
 Facts and Analysis
This case highlights what has become known in academia as the "two body problem," described to the Court as the problems which arise when two academics who are married seek employment at the same institution and face difficult questions as to dual job security (often inextricably bound to the institution's policies as to tenure). Kathy Ann Trover (Ms. Trover), an expert presented by the Defendant, testified that this *Page 11 
dilemma often requires the institution to reach "novel" or "creative" solutions relative to dual career hiring, especially in the absence of a tenured or tenure track position for both partners. Ms. Trover has studied tenure issues extensively and pursues research in such areas as part of her current appointment at Harvard University.[6]
The facts are as follows. In the spring of 2000, Brown University actively recruited Paul B. Armstrong (Professor Armstrong or Armstrong), Plaintiff's husband, to come to Brown as the Dean of the College. At the time of his recruitment, Armstrong held a tenured professorship at the State University of New York at Stony Brook ("SUNY"). He was then, and remains, married to Plaintiff, who also held a tenured professorship at SUNY. Initially, Professor Armstrong was invited to Providence to meet with a search committee for the position of Dean of the College.
At the end of June 2000, the University Provost, Kathryn Spoehr (Provost Spoehr), offered Armstrong the position of Dean of the College and asked him what terms and conditions he would require prior to accepting the position. During the early stages of Armstrong's negotiations, Provost Spoehr was his primary contact at Brown.[7] In response to Provost Spoehr's initial inquiry, Armstrong responded that his wife would not be able to leave her tenured position at SUNY and join him at Brown without an appropriate faculty appointment. Armstrong further clarified that he and his wife had a *Page 12 
young son; thus he could not accept a position at Brown without a similarly secure position for the Plaintiff. The Plaintiff was tenured at SUNY and previously had held a tenured position at Vassar College.
At this time, Provost Spoehr asked for Haviland's curriculum vitae ("CV"), so she could pursue the possibility of a tenured position for the Plaintiff in the area of her expertise, American Literature. It appeared that the best fit for an appropriate academic department at Brown would be either the Department of American Civilization ("AmCiv") or the Department of Comparative Literature ("CompLit"). Provost Spoehr told Armstrong that she would inquire about an appropriate faculty position for the Plaintiff and represented that she would get back to Armstrong.
In September, Provost Spoehr called Armstrong and told him she had spoken with both the AmCiv and CompLit Departments and there were no tenured positions in either Department available for the Plaintiff. At that time, Armstrong told Provost Spoehr it was not possible for him to accept the position at Brown without Haviland having her own secure faculty position. According to Armstrong, Provost Spoehr's reaction was to counsel Armstrong, telling him, "don't be hasty, let's keep talking." Thereafter, Armstrong's next contact was a telephone call from the Interim President of the University, Sheila Blumstein (Interim President Blumstein or President Blumstein).[8]
Apparently, Brown remained quite interested in recruiting Armstrong for the position of Dean of the College. President Blumstein had learned, presumably from Provost Spoehr, that there were no tenured positions available for the Plaintiff. This *Page 13 
news prompted President Blumstein to call Armstrong and tell him, "let's think outside the box," which was an indirect reference to what Ms. Trover noted as the need for a creative or novel approach to address the so-called "two body problem."
The telephone call ended with President Blumstein suggesting that they talk again in a few days. President Blumstein did call back, at which time Armstrong again outlined the three requirements that Haviland would need before the family would leave SUNY and begin working for Brown University. The three requirements were described by Armstrong as follows:
 1) Faculty benefits (relative to compensation, health benefits, sabbaticals, retirement, etc.).
 2) Recognition of rank, apparently referring to the fact that Plaintiff had held the rank of Associate Professor at both SUNY and Vassar and would require a similar title at Brown.[9]
 3) Employment security equivalent to tenure, even if no tenured faculty positions were available in AmCiv or CompLit.
The Plaintiff also spoke to President Blumstein and further explained what was meant by employment security: if, in the course of administrative changes, her husband lost his position as Dean of the College, Haviland did not want her position on the faculty to be affected. She told the President that she needed assurance that her employment renewal or retention would not be judged by a "shifting standard." After the conversations that both Haviland and Armstrong had with President Blumstein, they next heard from Brown through Provost Spoehr. The Provost represented to Haviland and Armstrong that President Blumstein wanted to try to work things out. Provost Spoehr told the couple to be patient because "this may take some time." *Page 14 
Although originally the University wanted Armstrong to begin his employment in September 2000, it was now clear that such a timetable was not possible. Thereafter, Armstrong and Haviland heard periodically from Provost Spoehr's assistant, Brian Casey. The next contact with the University came via a facsimile, which was transmitted to Plaintiff and Armstrong's home in Long Island, New York. The fax consisted of a cover page and two unsigned letters, all of which were dated October 16, 2000 and sent via Brian Casey from Mary Fennell, Dean of the Faculty (Dean of Faculty Fennell or Dean Fennell). The fax cover referred to the two letters as "relating to Beverly's [the Plaintiff's] offer." The letters were referred to by the University as a "pre-hire" letter and an "ancillary letter," which outlined the "process and standards for renewal of Haviland's contract." Brian Casey, on behalf of Provost Spoehr, explained in the cover sheet that the second or ancillary letter was in a draft form pending "final review from our general counsel."
As of October 16, 2000, the communications from Brown to Haviland and Armstrong suggest, at least inferentially, that Provost Spoehr, Dean of Faculty Fennell, and President Blumstein all understood the necessary conditions precedent to Armstrong's acceptance of the position as Dean of the College. The communications were in direct response to the three negotiating points that the Plaintiff and Armstrong outlined as a prerequisite to Armstrong's acceptance of the Deanship. In the October 16 fax, the first letter related to the issues of rank and title, Visiting Associate Professor and Senior Lecturer, in the Departments of CompLit and AmCiv. This letter also addressed the second criteria of pay and benefits and was copied to President Blumstein, Provost Spoehr, and the Department Chairs of CompLit and AmCiv. The first letter closed with *Page 15 
the words, "if the terms of this outline are satisfactory, please sign a copy of the enclosed formal offer[10] and return it to me." The first letter addressed only two of the three criteria discussed in negotiations; thus Haviland was unwilling to sign letter number one as the complete embodiment of the terms she was willing to accept. Only the so-called "ancillary letter" referred to the third criteria of job security.[11] The Court concludes, therefore, that only an offer integrating the terms contained in the first letter of October 16 and the "ancillary letter" would have been a satisfactory offer to Haviland at this time.
Most importantly, in the ancillary letter, "adequate cause for non-renewal" of her appointment was explicitly set forth as an exception to normal non-tenured faculty procedure. The ancillary letter continued to explain that "adequate cause for non-renewal shall be understood to be substantially equivalent to adequate cause for dismissal of a tenured faculty member from the University, which is defined in the Faculty Rules and Regulations as the following: demonstrated incompetence, dishonesty in teaching or research, substantial and manifest neglect of duty, or personal conduct which substantially impairs fulfillment of institutional responsibility." By reading the two letters of the October 16 fax together, it became clear to the Court that the University, through members of the senior administration, was responding in the affirmative to the three criteria previously discussed during negotiations.[12] *Page 16 
Although the Plaintiff could not be offered a tenured faculty appointment, the reference to tenure standards in the definition of "adequate cause for non-renewal" appeared to be both a creative and novel way to gain Armstrong's acceptance of his appointment as Dean of the College, even though Haviland's appointment was to a non-tenured position. Another way to describe the ancillary or supplemental letter is precisely the embodiment of "thinking outside of the box" as suggested by President Blumstein, as well as "a novel and creative solution to the two body problem" as referred to in the testimony of Ms. Trover.
Armstrong testified that together, the two draft letters of October 16 contained the University's affirmative response to all three of their negotiating points. In fact, after receiving the October 16 fax, Armstrong spoke to Provost Spoehr and indicated that if these two letters were finalized and approved by General Counsel, he would accept the Dean of the College position and Haviland would come to Brown. On October 18, Armstrong and Haviland were again sent a fax from Brian Casey, on behalf of Provost Spoehr. The October 18 fax contained two letters, signed by Dean of Faculty Fennell, which were substantially identical to the two unsigned drafts sent with the October 16 fax.
However, the cover sheet of the October 18 fax stated that "the drafts of the two letters were reviewed internally by [the University's] General Counsel's office." The letters were essentially identical to the October 16 drafts with some "minor language changes" made by General Counsel. For instance, where the October 16 letters said "[website address]," the actual website address was filled in on the October 18 letter. The October 18 letters did not vary from the October 16 drafts in any material respect. *Page 17 
Once again, Haviland and Armstrong were given assurance that their three demands of title, benefits, and job security relative to Haviland's appointment had been met. Most importantly, the October 18 letter contained the reference to tenure renewal standards in connection with any decision not to renew Haviland's appointment. See n. 11 supra.
Once again, the October 18 letters faxed to Haviland and Armstrong showed that all terms of the offer, at least as far as they were communicated to Haviland and Armstrong, had been approved by Dean of the Faculty Fennell, the third ranking member of the administration, by General Counsel of the University, and copied to Provost Spoehr. What was previously described as the ancillary letter and faxed to Haviland was now dated October 18 and mailed to her home in New York. The word "draft" was removed from this letter, and it was signed by Dean Fennell. Based on the receipt of these letters, Armstrong called Provost Spoehr and accepted the position of Dean of the College only because "all of the pieces" were now in place. Provost Spoehr offered her congratulations to Armstrong on the phone. An article appearing in the Brown Daily Herald, dated October 25, 2000, announced that Armstrong was coming to Brown as Dean of the College. The article also referred to Haviland's faculty appointment.[13]
On or about November 6, 2000, the Plaintiff received a note and attached letter from Dean of Faculty Fennell, noting that her appointment as Senior Lecturer had been approved by the Committee on Faculty Reappointment and Tenure ("Comfrat"[14]), but that University Counsel insisted on a follow-up letter "concerning [her] contract renewal as a Senior Lecturer [because Fennell's] previous letter [of October 18] focused more on *Page 18 
the Visiting Associate Professor side of [Haviland's] position."[15] It was not until Haviland and Armstrong were handed this November 6 letter, accompanied by the aforementioned note, that some uncertainty was injected into the hiring process. On or about this same time, Armstrong advised SUNY of his decision to leave the university and accept the Dean of the College position at Brown.
The November 6 letter addressed to Haviland and given to her when she and Armstrong were visiting the University showed that a copy had also been sent to Provost Spoehr. The letter from Dean of Faculty Fennell referred to the contents as an "offer,"see n. 10 supra, for appointment as Senior Lecturer in the Department of AmCiv. The letter also referred to the "anticipated approval" of Comfrat, as well as of the Corporation, which at Brown is tantamount to the Board of Trustees, and the President of the University.
The language which raised concern with Armstrong and Haviland was the final sentence, which stated, "this supercedes my letter to you of October 18." As noted earlier, it was the October 18 letter, which embodied the notion of job security and further referred to tenure-type standards for non-renewal. Armstrong testified that he was concerned that the "supercedes" reference meant that Brown was "reneging" on the agreement relating to Haviland's job security. In reaction to receipt of the November 6 letter, Armstrong called Dean Fennell and asked if the "supercedes" language meant that the situation with the Plaintiff had changed. Dean Fennell replied in the negative, *Page 19 
explaining that she did not intend to withdraw the October 18 promise, [16] which referred to the tenure-like standard for non-renewal.
Thereafter, in a letter dated November 17, 2000 and addressed to the Plaintiff, Dean Fennell stated that "the use of the term `supercedes' was unfortunate" and indicated that Haviland's appointment was to be both as Senior Lecturer and Visiting Associate Professor. Visiting professorships at Brown are generally not renewable beyond the initial term, which is usually only one year. However, Dean Fennell stated "exceptions in extraordinary circumstances can be made" and that she "would expect the University to consider [Haviland's] situation as one of those exceptions." Dean Fennell further explained that Haviland's initial appointment must comply with existing faculty and University rules.
Most importantly to the Plaintiff and Armstrong, Dean Fennell indicated in the November 17 letter that the use of the term "supercedes" was regrettable in that she "did not mean the October 18 letter was null and void." Although using an unfortunate double negative, the Court finds that Dean Fennell's reference was meant to be a reassurance to Plaintiff and Armstrong that the terms of the October 18 letter (also referred to as an "offer"), as to the renewal standard, remained in full force and effect. The November l7 letter tried to clarify the Plaintiff's dual appointments as Senior Lecturer and Visiting Associate Professor by referencing the language in the November 6 letter that described the position as a combination of the two appointments, explaining that the "two roles are virtually interlinked, and together encompass the usual academic responsibilities." *Page 20 
Additionally, the November 17 letter suggested that the October 18 and November 6 letters were both relevant because the letter dated November 17 describes the position more accurately as a "combination of Visiting Associate Professor and Senior Lecturer." Additionally, the November 17 letter also tried to clarify the Plaintiff's dual appointments by referencing that the language in the November 6 letter only relates to the regulations pertaining to her Senior Lecturer position, whereas the November 17 letter explains the conditions specified for renewal of both positions, stating ". . . assuming satisfactory performance of your responsibilities, renewal of your position would be subject to the same conditions specified above for the Visiting Associate Professorship." The "same conditions" set forth in the second paragraph of the November 17 letter are "the usual standards of competency, integrity in research and teaching, attention to duty and personal conduct consistent with institutional responsibility." The Court finds that these conditions were similar to the ones referred to as the tenure-like standard of adequate cause for non-renewal of the Plaintiff's employment agreement. The November 17 letter continued to explain that five years was not the usual period of appointment for a Visiting Associate Professor; however, because of the Plaintiff's hybrid appointment, the University would view the five year Senior Lecturer term with renewal, as coterminous with her appointment as Visiting Associate Professor, thereby incorporating a five year renewable appointment for both non-tenured positions.
The Court finds that it was reasonable for the Plaintiff to believe that although both positions were non-tenured, the University would use the tenure-like standard for renewal for both the Visiting Associate Professor and Senior Lecturer appointments as governed by the terms set forth in the October l8 letter, and reaffirmed by Dean Fennell *Page 21 
on November l7. In the end, this Court finds that it was reasonable for the Plaintiff to believe Dean Fennell's statement that the renewal of her appointment was "assured." The Plaintiff was aware that the standard set forth in the October l8 letter was unusual for non-tenured faculty, but the terms in that letter were clear and unambiguous. Ambiguities arose only when subsequent letters made reference to different lengths of time as to her appointments and listed the usual University rules and regulations as to the standards by which she would be judged for renewal and reappointment. The October l8 letter in its use of the phrases "except as outlined below" and the words "exceptions in extraordinary circumstances" assured Haviland that her appointment would be considered an "exception" to normal faculty re-appointment and renewal policies for non-tenured positions. The reasonableness of that belief is buttressed by the reference in the fax cover sheet from Dean Fennell, which accompanied the November l7 letter, stating, "At last! A version that passed muster with university counsel!" The Plaintiff's appointment, as Senior Lecturer and Visiting Associate Professor in the Departments of AmCiv and CompLit, was approved by the Corporation of Brown University during their meeting on December 8, 2000.
 Breach of an Employment Agreement
To say the least, the abundance of communications, both verbal and in writing from Brown to Haviland, makes it clear to the Court that Haviland's appointments were subject to a synthesis of terms that were referenced in different communications among Haviland, Armstrong, Provost Spoehr, Interim President Blumstein, and Dean of the Faculty Fennell. The Court heard testimony only from Haviland and Armstrong. The University chose not to present evidence from any of the other members of the Senior *Page 22 
Administration involved in the negotiations. For their version of the end-product, the Court has only the written communications, which in some respects are inconsistent, and letters, written by Interim President Blumstein and Dean Fennel, to current President Simmons explaining the earlier negotiations. See
n. 19 infra. Now the Court must resolve those inconsistencies. This controversy could have been avoided had the University attempted to create one integrated document containing an integration clause for both parties to sign as a codification of all the terms and conditions of the Plaintiff's employment at Brown.
An integration clause is "a contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract."Black's Law Dictionary 880 (9th ed. 2009). "Whether an agreement is completely or partially integrated is to be determined by the court as a question preliminary to determination of a question of interpretation or application of the parol evidence rule." Restatement (Second)Contracts § 210 (3) at 118 (1981). Furthermore, as explained in comment b of § 210, "[t]hat a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence. A writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties." Id. The Supreme Court of Rhode Island has "held that parol or extrinsic evidence is admissible to . . . bring out all the circumstances surrounding a transaction . . . or to complete a writing that is incomplete and which it is apparent from an inspection of the writing does not include the entire agreement of the *Page 23 
parties[.]" Fram Corporation v. Davis,121 R.I. 583, 588, 401 A.2d 1269, 1273 (1979) (internal citations and quotations omitted).
Since such an integrated document does not exist, the Court must glean the terms of the agreement from a myriad of correspondence and communications between the Plaintiff and Brown University. This Court finds that — despite current protestations from certain members of the University Administration[17] — there was a meeting of the minds[18] on the terms of the offer in that it corresponded to the three criteria of title, benefits, and job security referred to by Armstrong as conditions of Haviland's appointment that were required for him to accept the Deanship.
The following have been found to be "factors which have been considered as critical to evaluate whether an implied contract right to job security exists . . . (a) evidence of some `separate consideration' beyond the employee's services to support the implied term, (b) longevity of employment, (c) employee handbooks and policy manuals, (d) detrimental reliance on oral assurances, pre-employment interviews, company policy and past practices[,] and (e) promotions and commendations." Hinson v. Cameron and Comanche CountyHospital Authority, 742 P.2d 549 (O.K. 1987). Here, evidence of Haviland's "separate consideration" is evidenced by the sale of her home in New York *Page 24 
and subsequent, purchase of a new home for her family in Rhode Island. Haviland uprooted her family because of the five year term limits set forth in her contract. The University's version of "employee handbooks and policy manuals" established criteria for renewal of appointment differing from the standard negotiated by Haviland and the University prior to her accepting the job offer. Based on the communications between the Plaintiff and the Defendant, it is clear that the University intended to carve out of their handbook an exception for Haviland. Job security was an essential element necessarily present in Haviland's employment agreement for Armstrong to accept his Deanship position. As stated,supra, the Senior Administration of the University was aware at the time of Haviland's hire that it was necessary for her employment to reflect the three criteria of title, benefits, and job security for Armstrong to accept the Deanship. The Plaintiff's "detrimental reliance on oral assurances" from Provost Spoehr to "think outside of the box" — along with notes from Dean of Faculty Fennell explaining, "At last! A version that passed muster with University Counsel!" — assured Haviland that the terms of title, benefits, and job security were present in the offer. Thus an enforceable agreement between Haviland and the University was entered. See Zadrozny v. City Colleges of Chicago,581 N.E.2d 44 (Ill.App.1 Dist. 1991) ("An implied contract is created by law as a result of the parties' acts.") (citations omitted.)
In terms of the equities considered by the Court in making these conclusory findings, both sides acted in ways that confused, rather than clarified, the relationship. Brown never drafted a complete integrated agreement, but rather placed varying and sometimes contradictory terms in a variety of communications with Plaintiff. On the other hand, Professor Haviland confused the matter further on November 19, 2000, by *Page 25 
purporting to formalize her acceptance of the terms set forth in the November 6 letter, despite the fact that the tenure-like standards for renewal were not specifically set forth in that letter.
The Court finds that it was not Haviland's intent to accept the terms set forth in the November 6 letter without the inclusion of language similar to that contained in the October 18 pre-hire letter, which she was assured by the University, remained in full force and effect. Haviland did not sign the November 6 "offer" letter (dated November 8) until November 19, after she received the November 17 reassurance as to her job security and renewal standards. But cf. Soni v. Board of Trustees of theUniversity of Tennessee, 513 F.2d 347 (holding that the District Court judge "properly considered all of the circumstances of the employment relationship and correctly concluded that the plaintiff had a viable understanding that his employment would continue on a permanent basis with the Department of Mathematics, notwithstanding the statement contained in the October 29 correspondence that [plaintiff's] position was one without tenure[.]")
If necessary, this Court can and should look outside the written documents to glean the intent of the parties. An implied-in-fact contract is "a form of express contract wherein the elements of the contract are found in and determined from the relations of, and the communications between the parties, rather than from a single clearly expressed written document." Marshall Contractors,Inc. v. Brown University, 692 A.2d 665 (R.I. 1997) (citations omitted.) "Agreements to and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, whether or not integrated; . . . and/or ground for granting or denying rescission, reformation, specific performance or other remedy." Restatement (Second) *Page 26 Contracts § 214 at 133. As is the nature of contracts, the terms of the offer for employment were bargained for between the parties, and became part of the agreement when accepted by Haviland, as clarified on November 17. But cf. Marshall Contractors,Inc., 692 A.2d at 669 (finding that the "inability of the parties to ever reach mutual agreement on what the scope of the project was intended to include certainly constituted the very heart and vital essence of their ongoing contract negotiations and prevented the emergence and the existence of any implied-in-fact contract.") As set forth in Restatement (Second)Contracts § 24, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Notwithstanding reference to more standard University practices for renewal of non-tenured appointments in letters received in November 2000, Haviland acted reasonably in construing the offer which she accepted as an "exception" to normal University standards, both as to the length of terms and the standards to be used for reappointments and renewals. Thus an enforceable contract was entered. Contra The Johns HopkinsUniversity v. Ritter, 114 Md.App. 77, 689 A.2d 91 (M.D. 1997) (concluding that there was no evidence that anyone at Hopkins in rank above the Director of the Department of Pediatrics had even met the plaintiffs or were aware of the negotiations prior to their conclusion, much less said or did anything to lead them to believe that the Director was authorized to promise tenure.)
 Equitable Estoppel
Although the Court finds that Haviland and the University entered into a binding employment contract, there is also an independent equitable basis for finding the terms of the agreement enforceable under the doctrine of promissory estoppel. The doctrine of *Page 27 
promissory estoppel is defined as "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second)Contracts § 90 at 242 (1981). Although, the doctrine of promissory estoppel was developed as a substitute for consideration, our Supreme Court has extended its application to "varied situations in which the promisee's reliance on the promise was induced, and injustice may only be avoided by enforcement of the promise."East Providence Credit Union v. Geremia,103 R.I. 597, 601-02, 239 A.2d 725, 728 (1968). The Supreme Court inFilippi v. Filippi, set forth a three-element approach to establish promissory estoppel: "a clear and unambiguous promise; reasonable and justifiable reliance upon the promise; and detriment to the promisee, caused by his or her reliance on the promise."818 A.2d 608, 626 (2003); see Nilavar v. Osborn,127 Ohio App.3d 1, 711 N.E.2d 726, 736 (1998).
This Court finds that Haviland has satisfied all three of the elements constituting promissory estoppel. With respect to the first element, the October 18 letter contains a clear and unambiguous statement of the criteria to be applied for non-renewal of her employment agreement. The import of this letter was reaffirmed in the November 17 letter written by Dean Fennell.
Additionally, the Plaintiff's reliance on these promises was clearly justified, considering that the Dean of the Faculty, Provost, and Interim President of the University were those involved with the offering of such promises. Contra Campbell v.Sirak, 476 F.Supp. 21 (1979) (holding that the plaintiff unreasonably relied to his detriment "upon his own mistaken beliefs, and not upon promises made to him" by the University.) Such *Page 28 
justification was conceded during the testimony of Ms. Trover, the Defendant's expert, that traditional tenure structures can impede recruitment of two spouses with the so-called "two-body" problem. Therefore, Ms. Trower testified, it would be reasonable for a job applicant to rely on promises contained in a letter from the Dean of the Faculty, if the letter followed a statement from the Interim President that the parties should try to "think outside the box" to develop a creative solution to this problem. According to Ms. Trower, a candidate, such as Haviland, has the right to "trust the President" of the University and reasonably rely upon assurances made to her by senior administrators under these circumstances. The University's own expert conceded, and this Court agrees, that it was reasonable for the Plaintiff to rely upon the promises she received from the University.
Finally, Haviland has suffered detriment in relying on the Defendant's promise of employment security when she resigned from her tenured position at SUNY, placed her Long Island, New York home on the market, purchased a home in Rhode Island, and proceeded to move her family from New York to Rhode Island to start her employment at Brown University. See cf. Hayes v.Plantations Steel Company, 438 A.2d 1091 (R.I. 1982) (holding that the plaintiff's decision to retire was not induced by his reliance on a statement made, from an officer and stockholder of the company, to the plaintiff because he had "made the decision on his own initiative" and "reached that decision long before the conversation took place"). In Srail v. RJF InternationalCorporation, the Ohio Court of Appeals set forth the factors to be considered for the doctrine of promissory estoppel to apply in the employment context,
 . . . the employee must point to some representation by the employer that may be reasonably interpreted as limiting the *Page 29 
employer's ability to terminate the employee at will. Specific promises of job security must be clear and unambiguous. Additionally, an employee must show that he detrimentally changed his position in reliance on the employer's representation. The employee's reliance is reasonable if the employer should have expected the employee to base his actions or forbearance on the employer's promise. (internal citations omitted.)
126 Ohio App.3d 689, 711 N.E.2d 264. Moreover, our Supreme Court has enumerated the final condition precedent for the invocation of promissory estoppel as a question of whether ". . . injustice [can] be avoided only by enforcement of the promise." 1 Restatement (Second) Contracts § 90 at 110. This Court concludes that there is no doubt that the Senior Administration at the University was aware that Haviland was unwilling to relinquish her position, job security, and status that she had earned at SUNY unless Brown provided adequate assurance of similar protections. Depriving the Plaintiff of this security — after she and her family had relied on the repeated assurances of the Dean of Faculty, Provost, and Interim President of Brown University — is the injustice that can be avoided only by enforcement of the University's promises, set forth in the October 18 and November 17 letters.
During the 2004 school year, the Plaintiff was reviewed for reappointment. TPAC recommended against reappointment, concluding that Haviland had failed to satisfy the AmCiv Department's standard of "sustained excellence in teaching." Haviland then realized that Brown failed to honor its agreement relative to her renewal. TPAC's decision was forwarded to then Dean of the Faculty, Rajiv Vohra, and to the Provost, who at the time was Robert Zimmer. They both concurred with TPAC that the Plaintiff failed to satisfy the "sustained excellence in teaching" standard. However, Provost Zimmer determined that extenuating circumstances justified offering Haviland *Page 30 
reappointment for two and one-half years. Current President of the University, Ruth Simmons, received an appeal of that decision from the Plaintiff.[19] Provost Zimmer's decision was affirmed by President Simmons. At the conclusion of that renewal term in 2009, once again Haviland was reviewed for reappointment. She was again reviewed under the "sustained excellence in teaching standard," and currently serves a six year term, which expires in 2015. It is the University's uses of a standard other that that agreed to which gives rise to this controversy.See jurisdictional discussion supra. *Page 31 
 Conclusion
It is the judgment of this Court, and the Court declares, that Beverly Haviland's current employment agreement with Brown University is governed by the renewal terms as articulated in the letter dated October 18, 2000. The letter sets forth in pertinent part: Beverly Haviland's appointment shall be renewed for additional five year terms unless the University presents to her in writing adequate cause for non-renewal of her appointment and after she has been afforded the rights of due process as prescribed in Section 10.1.A of The Faculty Rules and Regulations. Adequate cause for non-renewal of Haviland's contract shall be understood to be substantially equivalent to adequate cause for dismissal of a tenured faculty member from the University, which is defined by The Faculty Rules and Regulations as the following: demonstrated incompetence, dishonesty in teaching or research, substantial and manifest neglect of duty, or personal conduct which substantially impairs fulfillment of institutional responsibility. Any review for reappointment of Professor Haviland using any other standard, including the Departmental standard of "sustained excellence in teaching," is contrary to the employment agreement between Beverly Haviland and Brown University.
Judgment shall enter in accordance with this declaratory conclusion.
[1] During trial, Plaintiff agreed to dismiss all claims against President Simmons personally, since it appears any actions taken by President Simmons were performed exclusively in her official capacity and therefore replicate the counts against the University itself.
[2] The doctrine of promissory estoppel was traditionally employed as a substitute for consideration rendering a gratuitous promise enforceable as a contract. East Providence Credit Union v.Geremia, 103 R.I. 597, 603, 239 A.2d 725, 728 (1968);see 28 Am.Jur.2d, Estoppel andWaiver § 48 at 657-658. In this jurisdiction, we have widened and extended the application of the doctrine. The doctrine has been applied to "varied situations in which the promisee's reliance on the promise was induced, and injustice may only be avoided by enforcement of the promise." Alix v. Alix, 497 A.2d 18 (1985);East Providence Credit Union,103 R.I. at 603, 239 A.2d at 727-728; Calamari Perillo,The Law of Contracts § 6-8 at 211 (2d ed. 1977); 1 Williston,Contracts § 140 at 611-614 (3d ed. Jaeger 1957).
[3] Even as to the declaratory claim, Plaintiff would be entitled to demand an "advisory jury" to resolve any disputed issues of fact. G.L. 1956 § 9-30-9. However, in this case, most of the factual considerations are inextricably tied to legal conclusions as to the formation and terms of the alleged agreement. Accordingly, fashioning issues to be resolved by an advisory jury would have posed a difficult task; thus the Court will determine all issues, factual and legal, without the intervention of a jury.
[4] The specifics of the employment agreement will be discussed in the following section.
[5] As set forth in § 9-30-12, the purpose of the UDJA "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations."
[6] Plaintiff objected to the admissibility of Ms. Trover's testimony, under R.I. R. Evid. 702. Since this case was being tried to the Court without a jury, the Court accepted the testimony of Ms. Trover to the extent that it might prove helpful to the Court (as the trier of fact) in understanding the issues. In general, the Court found Ms. Trover's testimony of limited assistance to the resolution of material fact issues. However, to the extent the Court considers her opinions, it will so indicate in this decision.
[7] The academic chain of command at Brown at the time of these discussions was as follows:
 Interim President: Sheila Blumstein
 Provost: Kathryn Spoehr
 Dean of Faculty: Mary Fennell
Others who became involved in the discussions among Armstrong, Haviland, and the University were Beverly Ledbetter, University Counsel, and Brian Casey, Assistant to Provost Spoehr.
[8] Sheila Blumstein is no longer President but remains a professor at Brown. Kathryn Spoehr is no longer the Provost but is also still employed by Brown. Neither Blumstein nor Spoehr was called to testify. Accordingly, the only testimony as to these preliminary discussions and negotiations is un-rebutted and comes solely from the Plaintiff and her husband.
[9] The testimony from all witnesses made it abundantly clear to the Court that professional title and tenure are important elements in the sub-culture of academia.
[10] There were several communications characterized by the University to be the "offer" or "formal offer." Such characterization is not necessarily binding on the Court's findings as to what constituted Brown's "offer" to Haviland.
[11] The ancillary letter of October 18 contained the following language, "Except as outlined below your appointment shall be governed by all the rules and negotiations pertaining to tenure faculty appointments at Brown University as listed in the Faculty Rules and Regulations . . . and by the procedures detailed in the Handbook for Academic Administration." The renewal terms, deemed the exception to the rule, were set forth in the second paragraph, which recites in pertinent part: "[y]our appointmentshall be renewed for additional five years terms unless the University presents to you, in writing, adequate cause fornon-renewal of your appointment." (Emphasis added.)
[12] For the sake of brevity, the three criteria will hereafter be referred to as "Title, benefits and job security."
[13] The Court did not accept the Brown news article as a full exhibit, in that it obviously contains substantial hearsay. However, the Court can consider the date of the news article for purposes of placing in time Armstrong's decision to accept the position of Dean.
[14] Comfrat was the acronym used at Brown to describe the Committee on Faculty Reappointment and Tenure.
[15] This Court finds that the October 18 letter mentions both of the Plaintiff's appointments as Visiting Associate Professor and Senior Lecturer and subsequently sets forth the criteria for adequate cause for non-renewal of her appointment. The letter states: "This letter provides supplementary information regarding [Haviland's] appointment as Visiting Associate Professor and Senior Lecturer at Brown University for a term of five years."
[16] Because Brown chose not to present former Dean of the Faculty Fennell as a witness, this Court considers Armstrong's testimony of the content of this conversation as unrebutted, uncontradicted and wholly credible. Accordingly, the Court finds as a fact that Dean Fennell said what Armstrong recounted in his testimony. SeeVargas Manufacturing Co. v. Friedman,661 A.2d 48 (R.I. 1995).
[17] Evidence of the potential for future protestations from the University's Administration is an email from Brian Casey to Provost Spoehr, referencing Haviland's agreement: "I do think the real risk to you [Provost Spoehr] is whether (if this all goes sour) you look like you were a Provost trying to give someone tenure through the backdoor." Regardless of the acknowledgment by Casey of the potential risk, the offer letters were drafted and sent to Haviland. The current University Administration must play with the hand that was dealt. It would be convenient for the current General Counsel, Ms. Ledbetter, to insist on the usual University standards for renewal of non-tenured faculty. Despite this effort at "Monday morning quarterbacking" and Counsel Ledbetter's current view that the terms offered to Haviland with respect to renewal and reappointment were perhaps too generous, the University left negotiations with Haviland and Armstrong to Dean Fennell, Provost Spoehr, and Interim President Blumstein. Accordingly, the University must now abide by the results of these negotiations.
[18] As set forth in Williston on Contracts, "[i]n the formation of contracts, . . . it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." 1 Lord, Williston onContracts § 4:1 (4th ed. 2007).
[19] Former Interim President Blumstein wrote to current President Ruth Simmons by letter on January 28, 2005 to explain the negotiations behind the Plaintiff's original hire, stating that
 [a]lthough we [referring to the University] were unable to offer [Haviland] a tenured position (there were no appropriate searches etc. available for which she could be considered), we offered her a position to meet the following conditions: She would receive a title that reflected her status as an associate professor; She would be reviewed following the same standards as tenured faculty; She would receive benefits similar to those accorded to regular Brown faculty. The details of the appointment, i.e. how it was to be implemented to meet these conditions, were determined at the time by Mary Fennell, Dean of the Faculty.
(Emphasis added.); see also Dean Fennell's letter dated January 27, 2005 to President Simmons regarding Haviland's appeal of her reappointment, explaining that the November 17 letter,
 . . . clearly specifies that the non-renewal conditions of the first letter [of October 18] were indeed part of her appointment offer, as well as the dual-title nature of her position described in the second letter. The understanding we shared was that our offer to Dr. Haviland encompassed both sets of conditions. This understanding was approved by both then-Provost Spoehr and Interim President Blumstein.
Both letters corroborate both Haviland's understanding and this Court's findings with regard to the employment agreement between the Plaintiff and Defendant. These letters, although not contemporaneous with the negotiations, contain the recollections of both the former Interim President Blumstein and Dean of Faculty Fennell. In the absence of their live testimony, these letters provide support for this Court's findings from the University officials most directly involved in the hiring of the Plaintiff.